relief against states or municipalities for unlawful regulation in violation of § 14501(c).

Because Petrey's federal right under § 14501(c) not to be regulated was violated, and because § 1983 relief was available for the violation of that right, we remand this case to the district court for a determination of the amount of damages, if any, that Petrey has incurred due to the violation of her federal right, as well as whether Petrey is entitled to attorneys' fees, expenses, and costs under 42 U.S.C. § 1988. It is important to note, however, that because the challenged Class A license requirements are not preempted, Toledo, in applying these Class A license provisions, has not violated Petrey's federal right not to be regulated. Thus, no damages can be awarded based on the City's decision to deny Petrey's towing company the opportunity to perform non-consensual tows for the Toledo Police Department.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** in part and **REVERSE** in part the district court's decision granting Petrey's motion for summary judgment on her preemption claims. We also **AFFIRM** the district court's decision that Petrey was denied a federal right for which § 1983 relief is available, and **REMAND** to that court for a determination of the amount of damages, if any, that Petrey has incurred.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0093P (6th Cir.)
File Name: 01a0093p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ANNA S. PETREY, d/b/a
MAGNUM TOWING,
        *Plaintiff-Appellee,*

        *v.*

CITY OF TOLEDO,
        *Defendant-Appellant.*

No. 99-4441

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 98-07188—James G. Carr, District Judge.

Argued: November 29, 2000

Decided and Filed: April 2, 2001

Before: DAUGHTREY and MOORE, Circuit Judges;
CLELAND, District Judge.[*]

_____

### COUNSEL

**ARGUED:** James G. Burkhardt, OFFICE OF THE CITY OF TOLEDO LAW DEPARTMENT, Toledo, Ohio, for Appellant. John D. Latchney, REMINGER & REMINGER,

---

[*]The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

Cleveland, Ohio, for Appellee.  **ON BRIEF:**  James G. Burkhardt, OFFICE OF THE CITY OF TOLEDO LAW DEPARTMENT, Toledo, Ohio, for Appellant.   John D. Latchney, REMINGER & REMINGER, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge.  Defendant, City of Toledo ("City" or "Toledo"), appeals the district court's order granting plaintiff-appellee Anna Petrey's motion for summary judgment with respect to her claim that various Toledo towing ordinances must be struck down under the preemption doctrine because they conflict with a federal statute, 49 U.S.C. § 14501(c).  Toledo also appeals the district court's decision granting summary judgment to Petrey on her claim that Toledo's violation of 49 U.S.C. § 14501(c) constituted a denial of her federal rights for which relief is available pursuant to 42 U.S.C. § 1983.

We **AFFIRM** in part and **REVERSE** in part the district court's decision in this case.

### I.  BACKGROUND

On April 3, 1998, Anna Petrey filed suit against the City of Toledo challenging the legality of the City's municipal towing provisions.  *See* Toledo, Ohio, Mun. Code ch. 765 (1998). Petrey contends that a series of Toledo's towing ordinances are preempted by 49 U.S.C. § 14501(c), a federal statute which provides, with some important exceptions to be discussed later, that "a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property."

of a taxicab operating license on the cab company's settlement of a labor dispute were preempted by the NLRA, held that § 1983 relief was available for the cab company due to the city's unlawful interference with the collective bargaining process.  *Id*. at 108-13.  The Court held that the NLRA did not have any "comprehensive enforcement scheme for preventing state interference with federally protected labor rights[,]" and that there was no question that the Court's previous holding that the city's conduct was preempted was within the competence of the judiciary to enforce.  *Id*. at 108-09.  The Court further held that the cab company was the intended beneficiary of the NLRA's provisions preempting state and local interference with the collective bargaining process.  *Id*. at 109.

Based on the analysis in *Golden State*, it is clear that the first step of the inquiry is met in Petrey's case.  Like the cab company in *Golden State*, Petrey's towing company was certainly the intended beneficiary of 49 U.S.C. § 14501(c)(1)'s express prohibition on state and local regulation of the towing industry.  Arguably, the preemption provision at issue in this case speaks even more clearly than the NLRA, which does not contain an express preemption provision, that states and municipalities are not to regulate the towing industry, except for certain narrow exceptions.  Thus, Petrey had a federal right under the preemption provision, and because Toledo regulated the towing industry in violation of that provision, Petrey was deprived of her federal right in this case.

As for the second step of the inquiry, the district court has convincingly shown that 49 U.S.C. § 14501 does not have a comprehensive enforcement mechanism that would preclude § 1983 relief for those injured due to unlawful state or local regulation of the towing industry.  J.A. at 311-12 & n.3 (D. Ct. Order, Oct. 21, 1999).  The district court correctly noted that while the ICCTA, of which § 14501 is a part, does have enforcement provisions, 49 U.S.C. §§ 14701-14709, none of these provisions allows Petrey to seek any form of

§ 1983 claims." J.A. at 312 (D. Ct. Order, Oct. 21, 1999). While we have concluded that all but one of Toledo's challenged towing provisions are not preempted by § 14501(c)(1), § 1983 relief may still be available if we conclude that Toledo's enforcement of § 765.02(c), the challenged provision that we have held to be preempted, violated any federal right Petrey has not be regulated.

Cities can be sued directly under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). In the landmark case of *Maine v. Thiboutot*, 448 U.S. 1, 4-8 (1980), the Supreme Court held that § 1983 suits are available when those acting under color of state law violate federal statutes. A two-step inquiry is used to determine whether § 1983 remedies are available for a violation of a federal statute. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989). The plaintiff must first assert a violation of a federal right. *Id*. To violate a federal right, the federal provision at issue must create a clear obligation that binds the governmental unit, and not simply state a "congressional preference for certain kinds of treatment." *Id*. (quotation omitted). In addition, the Court requires that the asserted right not be so vague or amorphous such that it is beyond the competency of the judiciary to enforce. The Court also asks whether the provision at issue was intended to benefit the plaintiff. *Id*.

The second step of the inquiry is to ask, even if the plaintiff has asserted a federal right, whether the defendant can "show that Congress specifically foreclosed a remedy under § 1983 by providing a comprehensive enforcement mechanism for protection of a federal right[.]" *Id*. (quotation omitted). The burden of showing that a federal statute's enforcement scheme precludes § 1983 relief is on the defendant, and the Court does not lightly conclude that Congress did not intend for § 1983 relief to be available to enforce a federal statute. *Id*. at 106-07.

In *Golden State*, the Supreme Court, following its previous decision that Los Angeles's attempts to condition the award

Chapter 765 of the Toledo Municipal Code requires, with limited exceptions, that anyone operating a tow truck within the City obtain a towing license from the City's Director of Finance. Toledo Mun. Code § 765.02(a)-(b) (1998).[1] Two types of licenses are available to tow truck drivers: Class A and Class B. *Id*. § 765.02(a)(1), (2). A Class B license permits a tower to conduct private and third-party tows. *Id*. § 765.02(a)(2). A Class A license, however, in addition to private and third-party tows, permits the holder to conduct non-consensual tows ordered by the Toledo Police Department. *Id*. § 765.02(a)(1).

While both Class A and Class B applicants must meet certain requirements to be issued a license, the requirements for a Class A license are more onerous and expensive. To obtain a Class B license, an applicant must: 1) pay a filing fee, *id*. § 765.06(a)(1); 2) furnish a certificate of insurance evidencing that the tower is insured up to at least the City's prescribed minimum coverage, *id*. § 765.06(a)(2); 3) fill out an application listing general information about the business and its owners or partners, including any criminal record each owner or partner might have, *id*. § 765.06(a)(3)-(4); and 4) maintain a storage facility within City limits if the tower is to perform third-party tows in the City. *Id*. § 765.05(e)(4).

To obtain a Class A license, however, the applicant must: 1) pay a filing fee that is approximately four times as expensive as the Class B fee, *id*. § 765.03(a)(1); 2) maintain significantly more insurance coverage, *id*. 765.03(a)(2); 3) ensure, for police tows only, the availability of at least three approved tow trucks, *id*. § 765.03(b)(4); 4) provide storage space for a minimum of one hundred vehicles, at least

---

[1] The City of Toledo amended Chapter 765 of its Code shortly before this lawsuit was filed. Under the modified provisions, the Class A and Class B "licenses" are now called "safety permits." Toledo Mun. Code § 765.02(a)(1)-(2) (1998). This modification does not affect our analysis. For semantical consistency with the parties and the district court, we will continue to refer to the permits as "licenses." All of the ordinances cited, unless otherwise noted, are current.

twenty-three of which must be at the licensed premises, *id.* § 765.03(b)(5); and 5) maintain a valid special use permit for any licensed premises and auxiliary storage site, *id.* § 765.03(b)(7).[2]  If all of the Class A license requirements have been met, then the Director of Public Safety must approve the application.[3]

The City is divided into a number of police towing districts, the amount and boundaries of which are also determined by the City's Director of Public Safety.  *Id.* § 765.07(a)-(b). Police towing work in each towing district is rotated among the Class A license holders in that district. *Id.* § 765.07(c). For several years in the 1990s, the City had granted Class A licenses to the same eleven towing companies for all of the police towing in the city. *See* Rule of the Director of Public Safety No. 10034.[4]

Petrey's towing company, Magnum Towing, first began towing in 1991, and Petrey applied for and was issued a Class B towing license for that year.  Petrey failed to renew her license in 1992 and 1993, however, and in 1994, one of

----

[2]Until the 1998 revisions to Chapter 765, Toledo had imposed additional requirements for Class A applicants, some of which are challenged by Petrey in this lawsuit.  These additional obligations included a requirement that all Class A applicants have conducted business in Toledo for at least two years prior to the date of application, as well as a heavy equipment commercial driver's license requirement for all of the applicant's tow drivers.  Toledo Mun. Code § 765.03(c)(3), (5) (1997).

[3]This provision represents another change of course for the City of Toledo, for until the 1998 revisions, even though an applicant may have met all the requirements for a Class A license, this did not guarantee that a license would be awarded.  § 765.07(c) (1997).  Under the former provision, the Director of Public Safety ultimately determined how many Class A licenses would be granted based on the towing needs of the Police Department. *Id.*

[4]The City asserts that this Rule has since been rescinded. *See* § 765.04(a) (mandating that all Class A applicants who meet the City's requirements shall be granted a Class A license).

motor transportation industry that a patchwork of local ordinances inevitably would create." *Mayer*, 158 F.3d at 546.

In light of both the statutory language and legislative history of § 14501, we hold that Toledo does not have the authority to engage in safety regulations under § 14501(c)(2)(A). Because Toledo may not avoid preemption under this exception, we need not address the issue whether § 765.02(c), or any of Toledo's other challenged provisions, constitute safety regulations that would fall within § 14501(c)(2)(A)'s exception to preemption.

To summarize, we hold that the towing provisions which Petrey has challenged that relate solely to the performance of non-consensual towing work for the City of Toledo fall within the municipal-proprietor exception to preemption, and thus are not affected by § 14501(c)(1).  The City's general license requirement for all City tow drivers, however, is not covered by this narrow exception to preemption, nor do any of the statutory exceptions to § 14501(c)(1) apply.  Therefore, § 765.02(c), though no longer a part of the Toledo Municipal Code, is preempted by § 14501(c)(1), and should not have been enforced against Petrey or any other towers within the City.  Thus, the district court's decision granting Petrey's motion for summary judgment with respect to her preemption claims is **AFFIRMED** in part and **REVERSED** in part.

## C.  Petrey's 42 U.S.C. § 1983 Claims

In Petrey's amended complaint, she alleged that the City's use of its towing regulations in spite of the federal preemption provision was injurious to her.  She sought damages as a result.  Both Petrey and the City have treated this claim as one arising under 42 U.S.C. § 1983.  The district court, after denying Toledo's motion for summary judgment with respect to Petrey's § 1983 claims, held that, in light of its finding that Toledo's challenged towing regulations violated the express preemption provisions of 49 U.S.C. § 14501(c), there was no genuine issue of material fact that Petrey was deprived of her federal right not to be regulated, and that Toledo's violation of § 14501(c) was "a sufficient basis for plaintiff's 42 U.S.C.

The same rationale applies to the current case. Congress explicitly mentioned political subdivisions numerous times in § 14501, including its explicit preemption of political subdivisions' regulation in § 14501(c)(1). We cannot say that Congress simply made a mistake by failing to include political subdivisions in the exception to preemption in § 14501(c)(2)(A). Instead, Congress's silence in failing to include political subdivisions in § 14501(c)(2)(A) clearly indicates that municipal safety regulation was not meant to be exempted from preemption.

### (ii)  Legislative History and Purpose

The legislative purpose and history of § 14501 also support the notion that Congress's failure to include political subdivisions in § 14501(c)(2)(A) was deliberate. Through the ICCTA, Congress intended to promote greater competition in the motor transportation industry. *Mayer*, 158 F.3d at 546. As expressed in the ICCTA's conference report, one of the means by which Congress intended to encourage market forces was through the elimination of a myriad of complicated and potentially conflicting state regulations, thus indicating that yet another level of regulation at the local level would be disfavored:

> [T]he conferees believe preemption legislation is in the public interest as well as necessary to facilitate interstate commerce. State economic regulation of motor carrier operations causes significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology and curtails the expansion of markets. . . . The sheer diversity of these regulatory schemes is a huge problem for national and regional carriers attempting to conduct a standard way of doing business.

H.R. Conf. Rep. No. 103-677, at 87 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1715, 1759. As the Eleventh Circuit correctly stated, "it is reasonable to assume that Congress decided that safety and insurance ordinances must be enacted on a statewide level, in order to minimize the disturbance to the

Magnum's employees was cited for towing without a license. After renewing her Class B license following the citation, Petrey applied for a Class A license in March 1995. Plaintiff's application was denied both because she had not been legally conducting business in the City during the previous two years as required by Toledo's towing provisions, and because the Director of Public Safety had already limited the number of Class A licensees to eleven. Petrey also applied for a Class A license in both 1996 and 1997, and her applications were similarly rejected. In 1998, Petrey's application was returned to her because she had not provided the City with enough information to grant either a Class A or Class B permit.

On April 3, 1998, Petrey filed suit in the United States District Court for the Northern District of Ohio seeking, on the grounds of preemption, "declaratory and injunctive relief precluding the City from enforcing those portions of Toledo Municipal Code Chapter 765 which deny and have denied Magnum a 'Class A' license and the right to perform non-consensual police tows." Joint Appendix ("J.A.") at 21 (Am. Compl.). More specifically, Petrey challenged the following Toledo towing provisions, all but one of which pertain only to Class A license holders: the storage space requirement, § 765.03(b)(5); the special use permit requirement, § 765.03(b)(6); the requirement that all Class A license holders have been in the towing business in the Toledo area for two years prior to applying for a Class A license, § 765.03(c)(3) (1997); the heavy equipment commercial driver's license requirement, § 765.03(c)(5) (1997); the Rule of the Director of Public Safety limiting the number of Class A licensees to eleven, Rule No. 10034; and the general requirement that all Toledo tow truck drivers obtain a special

towing license from the City, § 765.02(c) (1997).[5] J.A. at 238 (Pl.'s Mem. in Supp. of Summ. J.).

Petrey also sought compensatory and punitive damages pursuant to 42 U.S.C. § 1983, alleging that the City, through its application of the towing provisions, had violated her equal protection and substantive due process rights. Petrey further claimed that the City had retaliated against her for exercising her First Amendment rights by selectively applying its towing provisions following her complaints about the Class A license requirements.

On February 16, 1999, the City of Toledo filed a motion for summary judgment as to Petrey's claims. The district court engaged in a lengthy preemption analysis and ultimately concluded that 49 U.S.C. § 14501(c) permitted states, but not political subdivisions like the City of Toledo, to engage in safety regulation that had been exempted from the statute's general preemption provision. *Petrey v. City of Toledo*, 61 F. Supp. 2d 674, 676-80 (N.D. Ohio 1999). The district court further denied, without prejudice to renew, the City's motion for summary judgment as it pertained to Petrey's § 1983 claims. *Id.* at 680. The district court granted, however, the City's motion for summary judgment with respect to Petrey's First Amendment claim. *Id.* Finally, the district court granted leave to Petrey to file a motion for summary judgment by June 30, 1999. *Id.* at 681.

On June 30, 1999, Petrey filed a motion for summary judgment with respect to her claim that Chapter 765 of the Toledo Municipal Code is preempted by 49 U.S.C. § 14501(c). The City responded by renewing its motion for

---

[5]It is important to note that four of the six provisions specifically challenged by Petrey, including the general tow driver's license requirement in § 765.02(c), are no longer in effect. These provisions will not be at issue when discussing any potential injunctive or declaratory relief. We must still determine whether these provisions are preempted, however, for Petrey also seeks monetary damages pursuant to 42 U.S.C. § 1983 arising out of Toledo's enforcement of these provisions in violation of her alleged federal right not to be regulated.

exception to preemption as well, particularly because it was acting pursuant to the Michigan Constitution. *Id*. at 628. We quickly dismissed the City's argument, however, holding that the exceptions to preemption under the FRSA apply only to state laws or regulations, and that because Plymouth is not a state, Plymouth's ordinance cannot come within the exceptions to preemption. *Id*.

The facts in *Plymouth* are quite similar to those in this case. Just as in *Plymouth*, Toledo asks that we include its safety regulations within § 14501(c)(2)(A)'s exception to preemption. Like the FRSA in *Plymouth*, § 14501(c)(1) expressly preempts municipal regulation of the towing industry, but does not explicitly exempt municipal safety regulation from the general preemption provision. Just as in *Plymouth*, we refuse to include cities within an exception to preemption, the language of which is conspicuously devoid of any reference to political subdivisions.

*Ohio Manufacturers Ass'n v. City of Akron*, 801 F.2d 824 (6th Cir. 1986), *cert. denied*, 484 U.S. 801 (1987), also provides support for holding that § 14501(c)(2)(A) does not exempt municipal safety regulation from preemption. In that case we analyzed a rule of the Occupational Safety and Health Agency ("OSHA") that expressly preempted any "state law" pertaining to evaluating and communicating hazards to employees in the manufacturing sector. *Id*. at 827. Plaintiffs in the case argued that since state law was preempted, then necessarily municipal law would be preempted as well. *Id*. at 828. Defendants countered that if OSHA wished to preempt local regulation, it could easily have done so explicitly. *Id*. We held that municipal regulation was not preempted by this rule, stating that "[b]ased on Congress' practice of explicitly preempting political subdivisions and the fact that political subdivisions are referred to in other sections of the OSH Act, . . . Congress did not simply overlook including political subdivisions[, nor did] it implicitly include[] them in the word 'state.'" *Id.* at 829.

implies that political subdivisions are to be included within the exception. . . . [J]ust as the statutory silence in *Mortier* was insufficient to establish preemption in the first place, so the statutory silence here is insufficient to overcome the preemption otherwise expressly mandated by the statute.

*Mayer*, 158 F.3d at 547 n.7 (quotation omitted).

Section 14501 and FIFRA also differ in the number of references each statute makes to "political subdivisions." As the *Mayer* court explained, the specific FIFRA provision interpreted in *Mortier* made no reference to political subdivisions whatsoever, "and FIFRA as a whole contains only scattered mention of political subdivisions in its other parts." *Id*. at 547 (quotation omitted). We contrast FIFRA with § 14501, which contains seven references to political subdivisions overall, a reference to political subdivisions in the general preemption provision, and a reference to political subdivisions in one of the exceptions to the general preemption provision. § 14501(c)(2)(C). The natural conclusion derived from this language is that Congress did not intend to exempt political subdivisions from preemption when they attempt to engage in safety regulation.

Sixth Circuit case law also supports this conclusion. In *CSX Transp., Inc. v. City of Plymouth*, 86 F.3d 626, 627-29 (6th Cir. 1996), we analyzed whether a municipal ordinance enacted pursuant to state constitutional authority was preempted under the Federal Railway Safety Act ("FRSA"). The FRSA, as Congress intended, "preempt[s] all railroad safety legislation except state law governing an area in which the Secretary of Transportation has not issued a regulation or order and state law more strict than federal regulations when necessary to address local problems." *Id*. at 628. In *Plymouth*, the City, acting pursuant to its authority under the Michigan Constitution, enacted several railroad regulations. *Id*. at 627-28. Plymouth argued that, while the statutory language only explicitly exempted from preemption state regulation of railroad safety, the city should come within this

summary judgment with respect to Petrey's § 1983 claims. On October 21, 1999, the district court granted Petrey's motion for summary judgment, stating that the Toledo towing ordinances were preempted and ordering that the City be permanently enjoined from enforcing the provisions specifically challenged in Petrey's motion for summary judgment. The district court denied the City's motion for summary judgment with respect to Petrey's § 1983 claims, and, in light of its finding that Toledo's towing regulations were preempted by federal law, held that there was no genuine issue of material fact that Petrey was deprived of her federal right not to be regulated. Thus, the court held that the only issues left to be decided were the amount of damages, if any, that Petrey had suffered as a consequence of the City's regulations, and whether Petrey was entitled to recover attorneys' fees, expenses, and costs under 42 U.S.C. § 1988. The district court further held that, pursuant to Fed. R. Civ. P. 54(b), there "was no just reason for delay of the City's appeal" of the permanent injunction prohibiting Toledo from enforcing its towing provisions. J.A. at 356 (D. Ct. Order, Dec. 16, 1999). The City's appeal to this court followed. Pending appeal to this court, the district court, noting that the City had granted Petrey a Class A license for the course of the litigation, ordered a stay of its previous order enjoining the City from enforcing certain sections of its towing regulations.

## II.  ANALYSIS

### A.  Standard of Review

This court reviews *de novo* a district court's decision to grant summary judgment. *Thomas v. United States*, 213 F.3d 927, 929 (6th Cir. 2000). The moving party has the burden of establishing that there are no genuine issues of material fact, and that it is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). In reviewing the district court's decision to grant summary judgment, this court must view all the evidence in the light most favorable to the nonmoving party. *Thomas*, 213 F.3d at 929. Whether Toledo's towing provisions are preempted by 49 U.S.C. § 14501(c) is a

question of law that this court reviews *de novo*. *King v. Ford Motor Co.*, 209 F.3d 886, 891 (6th Cir. 2000).

## B. Preemption

The foundation of the preemption doctrine is the Supremacy Clause of the United States Constitution, which states that "the Laws of the United States . . . shall be the supreme Law of the Land[,] . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. When applying the Supremacy Clause, courts are to "assum[e] that the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). We now turn to the text of the preemption provision and to the arguments that the parties have made.

### 1. 49 U.S.C. § 14501(c)'s Text and Legislative History

The general preemption provision of § 14501(c) was first passed in 1994 as part of the Federal Aviation Administration Authorization Act, which attempted, in part, to deregulate the motor carrier industry. *See* Pub. L. No. 103-305, 108 Stat. 1569, 1606-07; *R. Mayer of Atlanta, Inc. v. City of Atlanta*, 158 F.3d 538, 541, 546 (11th Cir. 1998). The general preemption rule, recodified in its current form under the Interstate Commerce Commission Termination Act ("ICCTA") of 1995, effective January 1, 1996, provides that "a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." Pub. L. No. 104-88, 109 Stat. 803, 899 (codified at 49 U.S.C. § 14501(c)(1)).

There are two relevant exceptions to § 14501(c)(1)'s general preemption rule in this case. The first, passed in 1994 at the same time the general preemption provision was first enacted, allows the "State" to engage in various safety regulations without falling prey to the general preemption

subdivisions. *Id*. at 606. The Supreme Court, "start[ing] with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that [is] the clear and manifest purpose of Congress[,]" *id*. at 605, held that the statutory language and the legislative history of FIFRA never overcame that presumption, and that local regulation of pesticides was not preempted under the Act. *Id*. at 605-16. The Supreme Court recognized that "FIFRA nowhere expressly supersedes local regulation of pesticide use[,]" *id*. at 606, and further determined that, because states are permitted to regulate pesticides so long as they remain consistent with FIFRA, and because "political subdivisions are components of the very entity the statute empowers[,] . . . the more plausible reading of FIFRA's authorization to the States leaves the allocation of regulatory authority to the 'absolute discretion' of the States themselves, including the option of leaving local regulation of pesticides in the hands of local authorities." *Id*. at 608.

Unlike FIFRA, 49 U.S.C. § 14501 does contain express preemptory language prohibiting political subdivisions from regulating the towing industry. While we also start with the presumption that a state's police powers are not to be superseded by a federal statute unless it is the clear purpose of Congress, § 14501(c)(1) plainly states Congress's desire to preempt state and local regulation of the towing industry, with limited exceptions. The Eleventh Circuit's opinion in *Mayer* further highlights the differences between FIFRA and § 14501(c):

In *Mortier*, the Court faced a claim that the use of the word "State" without mentioning political subdivisions revealed Congress' "clear and manifest purpose" to preempt local regulation. In response, the Court held that Congress' silence concerning political subdivisions is not sufficient to satisfy this rigorous standard. Section 14501(c)(1), on the other hand, expressly preempts all state and local regulation of certain aspects of the motor transportation industry, and the question we must answer is whether Congress' silence in an exception to this rule

by political subdivisions is not exempted from the general preemptory language of § 14501(c)(1).

### (i)  § 14501's Statutory Language

The language of § 14501 provides fairly convincing evidence that the safety regulation exception to preemption was not meant to apply to a state's political subdivisions.  As mentioned above, within § 14501, "political subdivision[s]" are mentioned seven times, yet the term is not mentioned at all in § 14501(c)(2)(A).  In addition, for purposes of this statute, the term "State" is defined as "the 50 States of the United States and the District of Columbia."  49 U.S.C. § 13102(18).  The Supreme Court has held that when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quotation omitted); *see also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994) (same).  Because the term at issue is mentioned so frequently in § 14501, and yet is not mentioned at all in § 14501(c)(2)(A), the use of this presumption seems "particularly appropriate" in this case. *Mayer*, 158 F.3d at 545.  Applying this presumption in this case, we hold that, while states may regulate the safety of motor carriers, political subdivisions may not.

In *Ace Auto*, the Second Circuit relied, in part, on *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597 (1991), in finding that § 14501(c)(2)(A) exempts political subdivisions' safety regulation from preemption. *Ace Auto*, 171 F.3d at 775-76. *Mortier* appears readily distinguishable from this case, however. *Mortier* involved the interpretation of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). *Mortier*, 501 U.S. at 600-02.  This statute dictates that states may regulate the sale or use of pesticides so long as it is not prohibited by FIFRA.  FIFRA contains no general preemption provisions from which states are excluded, nor does it explicitly preempt regulation by political

provision. *See* 49 U.S.C. § 14501(c)(2)(A).[6]  The second exception to the general rule, added later pursuant to the ICCTA, permits a "State or a political subdivision of a State to enact or enforce a law, regulation, or other provision relating to the price of for-hire motor vehicle transportation by a tow truck, if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle."  49 U.S.C. § 14501(c)(2)(C).  Because § 14501(c)(2)(C) specifically exempts from preemption a state or political subdivision's regulation of the price of non-consensual tows, it is clear that Congress, when referring to "motor carriers" in the general preemption provision, had tow trucks in mind. *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 690-91 (5th Cir. 1999); *Mayer*, 158 F.3d at 543.

Rather than argue that Congress did not intend § 14501(c)(1) to apply to towing regulations,[7] the City of Toledo has pursued two alternate avenues by which it contends that § 14501(c)(1) cannot operate to preempt its towing ordinances. First, Toledo contends that the provisions challenged by Petrey all fall within § 14501(c)(2)(A), the exception to preemption allowing states to regulate the towing industry with respect to various safety concerns.  For reasons that will be discussed in detail later, we find this argument

---

[6] More specifically, § 14501(c)(2)(A) states that the general preemption provision "shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization[.]"

[7] All four circuits that have addressed the issue have held that § 14501(c)(1) does apply to state and local laws regulating towing services. *See Tocher v. City of Santa Ana*, 219 F.3d 1040, 1048 (9th Cir. 2000); *Cardinal Towing*, 180 F.3d at 691; *Ace Auto Body & Towing, Ltd. v. City of New York*, 171 F.3d 765, 774 (2d Cir. 1999); *Mayer*, 158 F.3d at 543.

unpersuasive.  Toledo's second contention, however, has more merit.  Rather than attempting to fit all of Toledo's towing provisions, concerning both consensual and non-consensual tows, into a statutory exception to § 14501(c)(1), Toledo argues in the alternative that its provisions setting the standards for towers who may conduct non-consensual, police-ordered tows on behalf of the City do not constitute laws, regulations, or provisions having the force and effect of law under § 14501(c)(1).  Rather, the City contends that these provisions reflect nothing more than Toledo's desire, like any private market participant, to conduct its business with those towing companies that can provide the requisite facilities, experience, equipment, and service to satisfy fully the City's towing needs.  In short, Toledo argues that even if its Class B license provisions, which deal with private tows, are preempted by § 14501(c)(1), its Class A license requirements fall under the municipal-proprietor exception to the preemption doctrine.[8]  The Fifth and Ninth Circuit Courts of Appeals have recently upheld various municipal towing provisions under the municipal-proprietor exception to preemption, and we join those courts today in holding that Toledo, when acting as a market participant, may set certain standards and ultimately choose those towers which are best able to perform non-consensual police tows for it, without being subject to § 14501(c)'s preemption provisions.

### 2. Municipal-Proprietor Exception to Preemption

Before delving into the circuit court cases recognizing the municipal-proprietor exception in the context of § 14501(c), we begin with the Supreme Court case that officially recognized that the municipal-proprietor exception, originally developed in the Court's dormant Commerce Clause

---

[8] The only Toledo towing provision not part of the Class A licensing requirements that Petrey has challenged is the requirement that all towers obtain a special City towing license before they can conduct tows within City limits.  *See* Toledo Mun. Code § 765.02(c) (1997).  The preemption analysis for this provision will be addressed separately from the challenged Class A license requirements.

### b.   Does the Statutory Language of § 14501(c)(2)(A) Apply to Cities?

Section 14501, on numerous occasions, makes reference to the power of both states and "political subdivisions" of those states to enact laws or regulations in various areas of intrastate transportation.  The general preemption provision of § 14501(c)(1) states that no "State [or] political subdivision of a State" may enact a law or regulation related to a "price, route, or service of any motor carrier . . . with respect to the transportation of property."  Section 14501(c)(2)(C), an exception to the general preemption provision, also explicitly exempts both states and political subdivisions of states from § 14501(c)(1) when regulating the price of non-consensual towing.  And while the term "political subdivision[s]" is mentioned seven times in 49 U.S.C. § 14501, the term is notably absent from the exception to preemption in § 14501(c)(2)(A).  Section 14501(c)(2)(A) states that the general preemption provision in § 14501(c)(1) "shall not restrict the safety regulatory authority of a *State* with respect to motor vehicles . . . or the authority of a *State* to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization."  (Emphasis added).

There is currently a conflict among the circuits regarding whether the omission of the "political subdivision" language in § 14501(c)(2)(A) reflects Congress's intent that safety regulation by political subdivisions not be exempted from preemption.  The Ninth and Eleventh Circuits have held that this exception does not apply to safety regulation by political subdivisions. *Tocher*, 219 F.3d at 1050-51; *Mayer*, 158 F.3d at 545-48.  The Second Circuit has come to the opposite conclusion, holding that safety regulation by political subdivisions does fall within the exception to preemption. *Ace Auto*, 171 F.3d at 775-76.  After analyzing the statutory language and legislative history of § 14501, as well as Supreme Court and Sixth Circuit precedent, we align with the Ninth and Eleventh Circuits in holding that safety regulation

§ 14501(c)(2)(C) exempts from preemption the regulation of "the price of for-hire motor vehicle transportation by a tow truck, if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle." So, while a city or state's regulation of the price of non-consensual police tows is permitted, Toledo's license requirement for all tow drivers doing work in the City clearly does not fit within this exception.[10]

The only other exception that applies in this case, and the exception upon which Toledo focuses its arguments, is § 14501(c)(2)(A), which states that the general preemption provision in § 14501(c)(1) "shall not restrict the safety regulatory authority of a State with respect to motor vehicles . . . or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization[.]" Toledo contends that all of its challenged towing provisions, including § 765.02(c), are statutorily excepted from preemption because they fall within the category of safety regulations. In determining whether Toledo's towing provisions are excepted from preemption under § 14501(c)(2)(A), we must answer two questions: 1) does the statutory language allowing the "State" to regulate the safety of motor vehicles apply to safety regulations by political subdivisions of states?; and 2) if so, do Toledo's towing provisions constitute safety regulations so as to fall under this exception to § 14501(c)(1)'s general preemptory language?

---

[10] Section 14501(c)(2)(C) allows political subdivisions to regulate the price of both private and police-ordered non-consensual tows. This exception does not apply to § 765.02(c)'s general towing license requirement, however, for § 765.02(c) is not a price regulation, nor does § 765.02(c) apply only to non-consensual tows.

jurisprudence,[9] also applies to preemption cases. *See Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 226-27 (1993). In *Associated Builders*, the Massachusetts Water Resources Authority ("MWRA"), an independent government agency given various water supply and treatment responsibilities by the Massachusetts Legislature, was issued a court order to clean up the Boston Harbor following a lawsuit arising out of the MWRA's failure to keep the Harbor clean. *Id*. at 220-21. The court order required the clean-up project to proceed without interruption and made no allowance for delays arising out of labor disputes. *Id*. at 221. Thus, the MWRA and Kaiser, MWRA's project manager for the cleanup, devised a labor agreement that attempted to assure labor stability over the course of the project. *Id*. at 221-22. The agreement required the use of specific methods to resolve any labor disputes, and "that all employees be subject to union-security provisions compelling them to become union members within seven days of their employment[.]" *Id*. All contractors and subcontractors were required to comply with the labor agreement if they wished to work on the cleanup project. *Id*. at 222.

---

[9] "The negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace[.]" *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (quotation and internal citations omitted). The Supreme Court's dormant Commerce Clause jurisprudence has consistently articulated the distinction between the State acting as a market regulator and the State acting as a market participant, explaining that "where a State acts as a participant in the private market, it may prefer the goods or services of its own citizens, even though it could not do so while acting as a market regulator." *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 685 (1999). The Court noted that the market participant, or municipal-proprietor, exception makes sense in the dormant Commerce Clause context "because the evil addressed by those restrictions–the prospect that States will use custom duties, exclusionary trade regulations, and other exercises of governmental power . . . to favor their own citizens–is entirely absent where the States are buying and selling in the market." *Id*. (citation omitted).

A company awarded a contract from MWRA sought to enjoin enforcement of the labor agreement, claiming that the labor agreement was preempted by the National Labor Relations Act ("NLRA"). *Id*. at 223. The Court disagreed, and in doing so noted the important difference between the State's role as regulator and its role as a market participant. *Id*. at 226-29. The Court explained that "pre-emption doctrines apply only to state regulation[,]" and not to a State's actions when it acts in its proprietary capacity. *Id*. at 227. Upon examining the MWRA's mandatory labor agreement for all contractors, the Court stated that, rather than this being an attempt to regulate the conduct of others, the labor agreement was simply an "attempt[] to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost." *Id*. at 232.

The Court contrasted this scenario to that in *Wisconsin Dep't of Indus., Labor & Human Relations v. Gould*, 475 U.S. 282, 283-84 (1986), in which Wisconsin enacted a statute forbidding its state procurement agents from purchasing any product known to be manufactured by labor law violators. *Associated Builders*, 507 U.S. at 228-29. In *Gould*, the Court held that this procurement statute was preempted by the NLRA, stating that it could not "even plausibly be defended as a legitimate response to state procurement constraints or to local economic needs[.]" *Gould*, 475 U.S. at 291. The Court viewed Wisconsin's conduct in enacting and enforcing the procurement statute as an attempt to use the State's spending power to deter violations of the NLRA, rather than as an effort by the State in its proprietary capacity to address a valid economic concern. *Associated Builders*, 507 U.S. at 228-29. As the Fifth Circuit explained, "[f]ollowing the logic of *Gould*, courts have found preemption when government entities seek to advance general societal goals rather than narrow proprietary interests through the use of their contracting power." *Cardinal Towing*, 180 F.3d at 692.

The Fifth Circuit, in *Cardinal Towing*, was the first court of appeals to apply the municipal-proprietor exception to the preemptive language of 49 U.S.C. §14501(c)(1). In this case,

City obtain a special towing license. Because § 765.02(c) requires all tow drivers to obtain a special towing license, even those not doing work for the Toledo Police Department, it clearly does not fall within the narrow exception to preemption for municipal actions driven by a purely proprietary interest. Thus, we will have to determine whether either of the relevant statutory exceptions to preemption apply.

Like several of the other provisions Petrey has challenged, § 765.02(c) has been removed from Toledo's towing provisions since the filing of her lawsuit, and thus will not be at issue for purposes of any potential declaratory or injunctive relief. We must still determine whether this provision is preempted by § 14501(c)(1), however, for Petrey also seeks monetary damages arising out of Toledo's enforcement of the challenged provisions pursuant to 42 U.S.C. § 1983.

As stated earlier, Toledo does not argue that § 14501(c)(1) is inapplicable to its towing provisions. Section 14501(c)(1) prevents states or political subdivisions from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property[,]" and all of the circuits that have addressed this provision have held that it applies to state and local laws regulating towing services. *See Tocher*, 219 F.3d at 1048; *Cardinal Towing*, 180 F.3d at 691; *Ace Auto*, 171 F.3d at 774; *Mayer*, 158 F.3d at 543. These courts have further held that ordinances similar to Toledo's do relate to a price, route, or service of the towing industry. *See Tocher*, 219 F.3d at 1047-48; *Cardinal Towing*, 180 F.3d at 691; *Ace Auto*, 171 F.3d at 771; *Mayer*, 158 F.3d at 545. Once it is acknowledged that § 765.02(c) relates to a price, route, or service of the towing industry, the plain language of § 14501(c)(1) preempts it, unless an exception to preemption applies.

### a. The Statutory Exceptions to Preemption

Section 14501(c)(1)'s general preemption provision is subject to several exceptions. As mentioned earlier,

work from the City, regardless of the tower's qualifications, equipment, or facilities. If § 14501(c)(1) preempted a City's efforts to set standards for those companies doing its police towing, then Toledo would have no choice but to work with towing companies with unusually slow response times or towers prone to damaging the cars they transport, so long as those towers wanted to work for the City. By setting standards for those companies who will be allowed to conduct police-ordered tows, Toledo can ensure that there will be sufficient space for the vehicles it needs to have towed, that any storage facilities to which the cars are towed will be safe, and that the drivers who operate the tow trucks will have the training to tow vehicles safely and efficiently. Furthermore, by limiting the number of participating towers in the Class A program, Toledo can ensure greater administrative efficiency and can better monitor the performance of all the towers involved.

Toledo's towing provisions dealing exclusively with non-consensual, police-ordered tows do not constitute attempts on the part of the City to regulate the towing industry as a whole, or to advance some general societal goal. Instead, these provisions do nothing more than serve the City's narrow proprietary interest in working with those towing companies who will be most able to meet safely and efficiently the Toledo Police Department's towing needs.

For these reasons, we hold that the challenged Toledo towing provisions dealing solely with those towers wishing to perform non-consensual police tows for the City, along with the Rule limiting the number of police towers to eleven, are proprietary in nature, do not constitute regulation or have the force and effect of law, and thus are not preempted by 49 U.S.C. § 14501(c)(1).

### 3. Does § 14501(c)(1) Preempt Toledo Mun. Code § 765.02(c)?

The only provision Petrey challenges that does not deal exclusively with non-consensual, police-ordered tows is § 765.02(c) (1997), which requires that all tow drivers in the

the city of Bedford, Texas repealed a statutory scheme in which local towing companies that applied and met certain requirements were placed into a rotation to do the city police department's towing work. *Cardinal Towing*, 180 F.3d at 688-89. Bedford replaced this scheme with an ordinance simply stating that the city's non-consensual police tows would be conducted by the company that receives a contract from the city. Under the ordinance, contract applicants had to meet a number of requirements. Applicants had to guarantee a towing response time of no more than fifteen minutes, as well as ensure access to a class-eight wrecker, a large towing vehicle able to remove tractor-trailer trucks. The ordinance did not affect private towing arrangements in any way.

A towing company that applied for, but did not receive, the contract to do the city's police towing challenged the statute in federal court on the grounds that it was preempted by 49 U.S.C. § 14501(c)(1). Following the Supreme Court's holding in *Associated Builders*, the Fifth Circuit decided that Bedford's ordinance authorizing the city to award a contract to the single towing company that best met its requirements was not preempted by 49 U.S.C. § 14501(c). *Id*. at 691-94. The court held that the city's actions were akin to private market participation, in which, rather than trying to promote general societal goals, it was attempting to fulfill a "narrow proprietary interest in its own efficient procurement of services." *Id*. at 693. The court explained that selecting a single company allowed for administrative efficiency and easier monitoring of towing performance, and that the specifications for contract eligibility imposed by the city were all related to efficient and reliable towing. *Id*.

While the towing provision at issue in *Cardinal Towing* dealt exclusively with non-consensual police tows and allowed the municipality to contract with only one towing company, the Ninth Circuit recently addressed a challenge to a broader towing scheme in Santa Ana, California, similar to Toledo's. *Tocher*, 219 F.3d at 1043. Santa Ana had enacted a number of towing provisions, many of which applied to all towers regardless of whether they performed towing work for

the City.  The general provisions created a permit requirement for both towing companies and tow truck drivers, and mandated that all towers maintain storage facilities, keep certain business hours, and publicly display towing rates. Another challenged provision, however, concerned only tows performed for the City police department.  This provision authorized the chief of police to establish a towing rotation for non-consensual police tows, to establish the standards for placement in the rotation, and to limit that rotation to the number of towers she deemed necessary.

The Ninth Circuit held that all of Santa Ana's generally applicable towing provisions were preempted by § 14501(c)(1), as they all related to prices, routes, or services of the towing industry, and because none of the statutory exceptions to preemption applied.  *Id*. at 1047-48, 1050-52. The court refused to preempt, however, the towing rotation for police-ordered tows, calling it a "classic example of a municipality acting as a market participant[,]" and noting that the provision "merely establish[es] rules and regulations to guide the formation of contracts for towing services provided exclusively to the City."  *Id*. at 1049.  The court further explained that while the provision at issue in the Fifth Circuit's decision in *Cardinal Towing* involved a contract for towing services with only one company, the fact that a city decides to contract with multiple companies for its police towing does not mean that it still cannot act under the municipal-proprietor exception to preemption. *Id*. at 1049-50.

The only difficulty the Ninth Circuit had with Santa Ana's police towing rotation provision was that it allowed only those towers who had obtained a City towing permit to participate in the rotation, the same generally applicable towing permit requirement that the court had just decided was preempted.  *Id*. at 1050.  The court held that, while the City could establish the standards and requirements for participation in the police towing rotation, it could not require that those towers obtain this generally applicable permit. Using the Santa Ana Municipal Code's severability provision,

the court struck down that part of the rotation provision that required towers to obtain the permit.  *Id*.

We join the Fifth and Ninth Circuit Courts of Appeals in holding that the municipal-proprietor exception applies to § 14501(c)(1).  *See Tocher*, 219 F.3d at 1050; *Cardinal Towing*, 180 F.3d at 694-96.  We agree with these circuits that the express preemption provision at issue in § 14501(c)(1) is strikingly similar to that in 29 U.S.C. § 1144(a), the ERISA preemption statute, and that because courts have consistently recognized the municipal-proprietor exception in the ERISA context, there is no good reason to limit the exception only to ERISA or NLRA cases.  *Id*.  We further agree that, aside from the statutory language, the municipal-proprietor exception is also consistent with the purpose of § 14501(c), which is to deregulate the motor carrier industry and "encourage market forces."  *Cardinal Towing*, 180 F.3d at 695; *see also Tocher*, 219 F.3d at 1050.

We must now ask whether the municipal-proprietor exception saves any of Toledo's challenged towing ordinances from preemption under § 14501(c)(1).  All but one of the ordinances challenged by Petrey relate solely to those towers wishing to perform non-consensual tows for the Toledo Police Department.  The specific Class A license requirements that Petrey has challenged, along with the Rule of the Director of Public Safety limiting the number of Class A licensees to eleven, only affect the provision of towing services to the City itself.  Like the police towing rotation provision in *Tocher*, these non-consensual police-tow provisions simply reflect the City's attempts to create rules and standards that will lead to the safe and efficient towing and storage of vehicles that would otherwise clog the streets of the City of Toledo.

Section 14501(c)(1) does not prevent Toledo from choosing the towers with which it will do business.  If Toledo did not have the ability to act as any other private market participant and decide who would perform its towing work, then it would arguably be forced to deal with all towers interested in getting