IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-50462
_____


BRENDA L STUCKY, doing business as Bill's Wrecker Service;
RICHARD VILLANEVA, doing business as Creswells 24 Hour
Wrecker Service

                    Plaintiffs - Counter Defendants -
                    Appellants

    v.

CITY OF SAN ANTONIO

                    Defendant - Counter Plaintiff -
                    Appellee

TEXAS TOWING CORPORATION

                    Intervenor Defendant - Counter
                    Plaintiff - Appellee

_____

Appeal from the United States District Court
for the Western District of Texas
_____

July 30, 2001

Before KING, Chief Judge, and REAVLEY and JONES, Circuit Judges.

KING, Chief Judge:

Plaintiffs-Counter Defendants-Appellants Brenda Stucky and

Richard Villaneva, owners of towing companies in San Antonio,

Texas, appeal the district court's grant of summary judgment in

favor of Defendant-Counter Plaintiff-Appellee the City of San

Antonio and Intervenor Defendant-Counter Plaintiff-Appellee Texas

Towing Corporation.  For the following reasons, we REVERSE the

judgment of the district court and REMAND for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The City of San Antonio's Towing Laws

This case involves the tow truck operations of Defendant-Counter Plaintiff-Appellee the City of San Antonio (the "City"). In 1963, the San Antonio City Council passed Ordinance No. 31977, which prohibited tow trucks from removing disabled vehicles from public streets and ways without being directed to do so by the Chief of Police or his authorized representative. Ordinance No. 31977 was enacted to combat the acknowledged practice of tow truck operators monitoring police radios for reports of accidents and then racing to the scene of those accidents to obtain the business of towing the wrecked vehicles. All parties apparently agree that the "lively competition" of the rival tow truck operators interfered with accident investigations and the provision of emergency care required at the scene.[1]

---

[1] This competitive environment, which resulted in attendant safety concerns, was recognized by a Texas court of civil appeals:

There is ample testimony to support the conclusion that the absence of restrictions on wrecker operators created serious problems. The not unusual situation was for several wreckers to appear at the scene of an accident, creating problems for officers who were attempting to restore the normal flow of traffic and seriously interfering with the efforts of police officers to investigate the accident and file the required reports. Wreckers were equipped with

2

Ordinance No. 31977 was subsequently amended to give the Manager of the Public Works Department the same authority as the Police Chief or his authorized representative and is now codified at § 19-391 in the San Antonio City Code. The current version of § 19-391 provides in relevant part:

> It shall be unlawful for any person, in the operation of an automobile wrecker on the public streets and ways of the city and not having been directed to do so by the chief of police, the parking manager of the public works department or authorized representatives, knowingly to move, tow, haul or otherwise transport in, on or over the public streets and ways of the city any vehicle which has been abandoned or which has been involved in a collision and is on a public street, way or other public property.

SAN ANTONIO, TEX. CODE ch. 19, art. XI, § 19-391(a) (1986).

Since 1977, the City has awarded its towing business to towing companies through an exclusive contract, whereby one company is the City's prime towing contractor for a certain period of time.[2] This contract provides that the designated city towing services company will "perform all necessary work for the removal from public streets, ways or other public property in the

---

radios capable of monitoring the police frequencies. When the wreckers arrived on the scene of the accident they would engage in fiercely competitive efforts to induce the car owners to engage their services. The result was disorder and confusion at the scene of the accident.

Andrada v. City of San Antonio, 555 S.W.2d 488, 490 (Tex. Civ. App.—San Antonio 1977, writ dism'd).

[2] In 1977, the City awarded an exclusive contract to City Towing Associates, Inc. In 1991, responding to complaints about anticompetitive and antitrust concerns, the contract with City Towing was amended to allow participation by subcontractors, with City Towing acting as the City's prime contractor.

3

City of San Antonio, vehicles which have been abandoned, which have been involved in collisions, parking violations, vehicles to be checked for evidence, and vehicles belonging to prisoners." See San Antonio Wrecker Service Contract ¶ II.

In 1993, after considering the bids of four towing companies, the City approved a five-year exclusive contract with Intervenor Defendant-Counter Plaintiff-Appellee Texas Towing Corporation ("Texas Towing"). On April 1, 1993, Texas Towing was awarded the "Wrecker Service Contract" (the "Contract") by way of City Ordinance No. 77716. In 1995, Texas Towing requested an amendment to the Contract, which would grant the City the option to extend the Contract for an additional five years.[3] On August 31, 1995, the City passed Ordinance No. 82744, creating the option to extend the Contract. Pursuant to this option, on May 7, 1998, the Contract was extended for an additional five years (Ordinance No. 87775), without invitation to the towing industry to bid for the Contract. The City enforces this exclusive right, granted to the contractor, against any other towing company that attempts to contract with the operator of a disabled vehicle at the scene.

### B. The Federal Law

---

[3] Texas Towing requested this option in order to allow it to secure additional financing and capital investment for new equipment. In order to obtain this additional financing, Texas Towing needed assurances from the City that it would keep the Contract in place for an additional number of years.

In 1994, the United States Congress enacted the Federal Aviation Administration Authorization Act (the "FAAA Act") to deregulate the motor carrier industry.  See Pub. L. 103-305, 108 Stat. 1569, 1608 (1994).  Section 601 of the FAAA Act amended the Interstate Commerce Act, preempting state and local regulations concerning the price, route, or service of intrastate motor carriers.[4]  In 1995, Congress passed the Interstate Commerce Commission Termination Act (the "ICCTA"), which took effect on January 1, 1996.  See Pub. L. 104-88, 109 Stat. 803, 804 (1995) (codified at 49 U.S.C. § 14501(c)(1)).  The ICCTA recodified former 49 U.S.C. § 11501(h) as 49 U.S.C. § 14501(c), and amended the statute to include an exemption for state regulation of nonconsensual tow rates.  As will be discussed infra in more detail, § 14501 provides for federal authority over intrastate transportation.

C. Plaintiffs'-Counter Defendants'-Appellants' Lawsuit

In December 1996, Brenda Stucky, doing business as Bill's Wrecker Service, and Richard Villaneva, doing business as Creswell's 24 Hour Wrecker Service (collectively referred to hereinafter as "Stucky"), sued the City for declaratory, injunctive, and monetary relief, alleging that § 19-391(a) and the City's exclusive Contract with Texas Towing pursuant to

_____

[4]  A "motor carrier" is defined as "a person providing motor vehicle transportation for compensation."  49 U.S.C. § 13102(12).

5

Ordinance No. 87775 (collectively referred to as the "Ordinances")[5] were preempted by 49 U.S.C. § 14501(c)(1) & (2). Stucky further alleged that enforcement of the Ordinances deprived it of a property and liberty interest, thus constituting a violation of 42 U.S.C. § 1983. Stucky later amended its complaint to include a Sherman Antitrust Act violation. In 1997, Texas Towing intervened in the lawsuit.

On July 14, 1997, Stucky filed a motion for partial summary judgment. The district court originally granted Stucky's motion for partial summary judgment, finding that § 14501(c)(1) preempted the Ordinances. Accordingly, the district court enjoined the City from further enforcement of the Ordinances. On a motion for reconsideration, however, the district court vacated its initial grant of partial summary judgment. After further motions for summary judgment, the district court issued an Order on August 25, 1998, granting in part and denying in part the various motions for summary judgment.[6]

---

[5] To be clear, the "Ordinances" defined herein collectively include Ordinance No. 31977, now codified at § 19-391 in the San Antonio Code, and the Contract with Texas Towing, only as they relate to "consent" towing. The practice of nonconsent towing, also covered by the Ordinances, is not before us on appeal. As used in this opinion, the term "consent tow" refers to a tow made with the consent of the owner or operator and the term "non-consent" tow refers to a tow made without the consent of the owner or operator of the vehicle.

[6] As the specific motions and counter-motions are not dispositive to this case, descriptions of these procedural filings have been omitted from this recitation.

In its Order, the district court granted in part Stucky's motion for summary judgment, declaring that Ordinance No. 82744 (amending the contract to provide an option to extend) and Ordinance No. 87775 (exercising that option) were preempted by § 14501(c)(1), but that the City's single-vendor towing system based on the Ordinances was not preempted. Further, the district court denied the City's and Texas Towing's claim that the Ordinances were exempted from preemption under 49 U.S.C. § 14501(c)(2)(A). However, the district court granted in part the City's and Texas Towing's motions for summary judgment, such that Stucky's claims for relief under 42 U.S.C. § 1983 and for monetary damages arising from violations of federal antitrust law were dismissed with prejudice. Finally, with respect to Stucky's claims for injunctive relief arising from antitrust law, the district court denied the City's and Texas Towing's summary judgment motions. On October 13, 1998, the district court entered final judgment in accordance with the Order. The parties appealed.

On appeal, after briefing and oral argument, this court decided Cardinal Towing & Auto Repair, Inc. v. City of Bedford, 180 F.3d 686 (5th Cir. 1999). On August 14, 1999, another panel of this court vacated the district court's judgment and remanded it to the district court in light of Cardinal Towing. See Stucky v. City of San Antonio, 204 F.3d 1115 (5th Cir. 1999) (unpublished table decision). On remand, the district court

7

again considered summary judgment motions addressing whether federal law preempts the City's Ordinances as they relate to consensual towing.

Based on its interpretation of Cardinal Towing, the district court held on remand that § 14501(c)(1) did not preempt the Ordinances as they related to the issue of consent towing. The district court, therefore, granted the City's and Texas Towing's motions for summary judgment on the issue whether the City's practice of contracting with a single towing company for consensual tows was preempted by federal law.[7] Finally, the district court denied Stucky's motion for partial summary judgment.

Stucky timely appeals this judgment.


## II. STANDARD OF REVIEW

The district court's preemption ruling is a determination of law and, therefore, is subject to de novo review. See Kollar v. United Transp. Union, 83 F.3d 124, 125 (5th Cir. 1996); see also Branson v. Greyhound Lines, Inc., 126 F.3d 747, 750 (5th Cir. 1997) ("We review de novo the district court's rulings on preemption."). Moreover, this court reviews a grant of summary

---

[7]    The district court also denied the City's and Texas Towing's motion for summary judgment on the issue of injunctive relief for alleged antitrust violations. However, on May 17, 2000, the district court amended its judgment and dismissed the remaining antitrust claims against the City and Texas Towing.

8

judgment <u>de novo</u>, viewing the evidence in the light most favorable to the nonmovant.  <u>Smith v. Brenoettsy</u>, 158 F.3d 908, 911 (5th Cir. 1998); <u>see also</u> <u>Tolson v. Avondale Indus., Inc.</u>, 141 F.3d 604, 608 (5th Cir. 1998).  "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)).  The moving party bears the burden of showing the district court that there is an absence of evidence to support the nonmoving party's case.  <u>See</u> <u>id.</u> at 325.  "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response.  If the movant does, however, meet this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." <u>Tubacex, Inc. v. M/V Risan</u>, 45 F.3d 951, 954 (5th Cir. 1995).  "A dispute over a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  <u>Smith</u>, 158 F.3d at 911 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  The substantive law determines which facts are material.  <u>See</u> <u>Anderson</u>, 477 U.S. at 248.

9

## III. PREEMPTION BY 49 U.S.C. § 14501(c)(1)

This is the second time this court has been asked to address the preemptive reach of 49 U.S.C. § 14501(c)(1). In <u>Cardinal Towing & Auto Repair Inc. v. City of Bedford, Texas</u>, we held that the City of Bedford's ("Bedford") single-contract towing ordinance for nonconsensual towing services was not preempted by § 14501(c)(1) because Bedford was acting as a "market participant" and not a "market regulator" in procuring towing services for individuals who could not consent to a towing company. <u>See</u> 180 F.3d 686, 697 (5th Cir. 1999). The instant case presents the question whether our analysis in <u>Cardinal Towing</u> also holds for a single-contract towing ordinance that governs <u>consensual</u> towing services. As will be discussed <u>infra</u> in detail, we conclude that the rationale of <u>Cardinal Towing</u> cannot be extended to the consent tow situation, and that § 14501(c)(1) preempts the City's Ordinances as they relate to consensual towing. However, this conclusion does not resolve the more difficult question that has split our sister circuits — whether the City's single-contract towing ordinance falls under the "safety exemption" provided in § 14501(c)(2)(A). This question will also be addressed below.

Because of the closeness of the questions before us, we set forth in some detail our preemption analysis under the reasoning of <u>Cardinal Towing</u>, guided by the other circuit courts of appeals

10

that have addressed the preemptive effect of § 14501(c)(1). We begin first with the general preemptive reach of § 14501(c)(1).

## A. Preemption Principles

The doctrine of federal preemption is rooted in the Supremacy Clause of the United States Constitution, which provides that "the Laws of the United States . . . shall be the supreme Law of the Land[,] . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. "As a consequence, state and local laws are preempted where they conflict with the dictates of federal law, and must yield to those dictates." Ace Auto Body & Towing, Ltd. v. City of New York, 171 F.3d 765, 771 (2d Cir. 1999); R. Mayer of Atlanta, Inc. v. City of Atlanta, 158 F.3d 538, 542 (11th Cir. 1998) ("[S]tate law that conflicts with federal law is 'without effect.'" (quoting Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992))). Standards governing preemption of state law also govern preemption of municipal ordinances. See Cardinal Towing, 180 F.3d at 690.

Federal law preempts state and local laws whenever (1) Congress has expressly preempted state action; (2) Congress has devised a comprehensive regulatory scheme in the area, thus "removing the entire field from the state realm"; or (3) state action directly conflicts with the "force or purpose" of federal law. See id. Thus, "[p]reemption may be either express or implied, and is compelled whether Congress' command is explicitly

11

stated in the statute's language or implicitly contained in its structure and purpose." Ace Auto, 171 F.3d at 771 (citations and internal quotations omitted). "However, when preemption is invoked to prevent a state or municipality from wielding its traditional police powers, congressional intent to displace that authority must be 'clear and manifest.'" Cardinal Towing, 180 F.3d at 690 (quoting California v. ARC Am. Corp., 490 U.S. 93, 101 (1989)). "Congressional intent, therefore, is the 'ultimate touchstone' of preemption analysis." Tocher v. City of Santa Ana, 219 F.3d 1040, 1045 (9th Cir. 2000) (quoting Cipollone, 505 U.S. at 516).

B. Express Preemption Under 49 U.S.C. § 14501(c)(1)

In Cardinal Towing, this court recognized that by enacting the FAAA Act, Congress intended to deregulate the motor carrier industry, including the towing services industry. See 180 F.3d at 690 ("In 1994, Congress moved to deregulate the motor carrier industry. Central to this effort was a section preempting most state and local regulation."). In this effort, the FAAA Act expressly included a general preemption provision, now recodified in the ICCTA as § 14501(c)(1):

> General rule.— Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property.

49 U.S.C. § 14501(c)(1).

12

The purpose of this provision was to eliminate overlapping state and municipal regulations, which increased costs, decreased efficiency, and reduced competition and innovation in the towing services industry. See Tocher, 219 F.3d at 1048 (citing H.R. CONF. REP. NO. 103-677, at 87 (1994)). "Congress recognized that dispersing regulatory authority over motor carriers would require a towing company to adhere to a multitude of different regulatory schemes in every locality where it conducted business and virtually destroy any opportunity for companies to maintain national or even regional standards for conducting business." Id. at 1048; see also Ace Auto, 171 F.3d at 772. Towing service companies have been recognized as motor carriers under § 14501(c) and are thus covered by the statute's reach. See Cardinal Towing, 180 F.3d at 691 ("[T]owing companies performing nonconsensual tows are "motor carriers.'").[8]

---

[8] This recognition derives from the addition of a limited exemption to § 14501(c)(1) added in the ICCTA that specifically exempts from preemption a state's or a political subdivision's regulation of the price of nonconsensual tows. See 49 U.S.C. § 14501(c)(2)(C). As the Court of Appeals for the Eleventh Circuit recognized:

> If Congress had not intended for § 14501(c)(1) to preempt state and local regulation of towing services generally, Congress would not have included an express exemption that applies solely to prices charged for nonconsensual towing services. . . . By including an express exemption for the regulation of prices for nonconsensual towing services, Congress has evinced its intent that all aspects of consensual towing services remain subject to the general rule set forth in the preemption clause.

Mayer, 158 F.3d at 543.

13

Based on the recognized purpose and a plain reading of the terms of § 14501(c)(1), every circuit court of appeals to have addressed the preemption issue has concluded that § 14501(c)(1) manifests a general congressional intent to preempt state and municipal ordinances that regulate the prices, routes, or services provided by towing companies.  See Petrey v. City of Toledo, 246 F.3d 548, 554 (6th Cir. 2001); Tocher, 219 F.3d at 1048; Ace Auto, 171 F.3d at 774; Mayer, 158 F.3d at 545.[9]  This determination that municipal regulations of towing services are generally preempted by § 14501(c)(1) comports with our conclusion in Cardinal Towing that, unless one of the exemptions to federal preemption applies, municipal regulations like the challenged Ordinances in the present case are preempted.

---

[9]  This conclusion is further supported by the House Report accompanying the proposed version of § 14501(c)(2)(C), which states that the purpose behind the amendment is to:

> provide[] a new exemption from the preemption of State regulation of intrastate transportation relating to the price of non-consensual tow truck services.  This is only intended to permit States or political subdivisions thereof to set maximum prices for non-consensual tows, and is not intended to permit re-regulation of any other aspect of tow truck operations.  The Committee had been asked to go farther and permit States and political subdivisions thereof to re-regulate all aspects of non-consensual tow truck services.  The Committee provision struck a balance between the need to protect consumers from exorbitant towing fees and the need for a free market in towing services.

H.R. REP. NO. 104-311, at 119-20 (1995), reprinted in 1995 U.S.C.C.A.N. 793, 831-32 (emphasis added).

14

With this background as guidance, we next address two possible exemptions to federal preemption under § 14501(c)(1): (1) the generally recognized "municipal-proprietor" exemption to preemption and (2) the "safety exemption" provided for in 49 U.S.C. § 14501(c)(2)(A).[10]  The district court found that the municipal-proprietor exemption applied to the Ordinances and, thus, they were not subject to federal preemption under § 14501(c)(1).  The district court did not address the safety exemption.  We address each in turn.

## IV. EXEMPTIONS FROM FEDERAL PREEMPTION

### A. The Proprietary Exemption Under *Cardinal Towing*

#### 1. The *Cardinal Towing* Decision

In Cardinal Towing, this court applied the "municipal-proprietor" exemption (also known as the "market-participant"

---

[10]  The safety exemption in § 14501(c)(2)(A) provides:

(2) Matters not covered.— Paragraph (1)—
   (A) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.

49 U.S.C. § 14501(c)(2)(A).

15

exemption) to the preemptive language of 49 U.S.C. § 14501(c)(1). See 180 F.3d at 694-95.  We need not reiterate the careful analysis of this doctrine set forth by the Cardinal Towing court, see id. at 691-95, except insofar as to emphasize the primary legal conclusions necessary to our decision.

First, the Cardinal Towing court recognized that preemption policies apply only to state "regulation" and not to actions that the state takes in its proprietary capacity.  See id. at 691 ("The law has traditionally recognized a distinction between regulation and actions a state takes in a proprietary capacity – that is to say, actions taken to serve the government's own needs rather than those of society as a whole."); see also Bldg. & Constr. Trades Council v. Assoc. Builders & Contractors of Mass./R.I., Inc., 507 U.S. 218, 227 (1993) (recognizing, in National Labor Relations Act cases, that "[o]ur decisions . . . support the distinction between government as regulator and government as proprietor"); cf. Wis. Dep't of Indus. Labor & Human Relations v. Gould, Inc., 475 U.S. 282, 289 (1986) (holding, in the Commerce Clause arena, that attempt to use spending power in a manner "tantamount to regulation" is subject to federal preemption); Petrey, 246 F.3d at 558; Tocher, 219 F.3d at 1049-50.

Second, the Cardinal Towing court determined that this distinction between a state acting in its regulatory capacity in contrast to its proprietary capacity is most readily apparent

16

when the government purchases the goods and services that its operations require in the open market. See Cardinal Towing, 180 F.3d at 691, 692 ("Most government contracting decisions do not constitute concealed attempts to regulate . . . [because i]n order to function, government entities must have some dealings with the market."). The court cautioned that while the government can exert substantial leverage through its spending power and while this power "may create a temptation to take advantage of these interactions to pursue policy goals," id. at 692, that at the same time, the fact of government involvement cannot be "assumed to be motivated by a regulatory impulse." Id.

Third, the court applied a two-part analysis to aid in "distinguishing between proprietary action that is immune from preemption and impermissible attempts to regulate through the spending power." Id. at 693. The court suggested asking two questions to evaluate the government action:

> First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?

Id. The court explained that "[b]oth questions seek to isolate a class of government interactions with the market that are so narrowly focused, and so in keeping with the ordinary behavior of

17

private parties, that a regulatory impulse can be safely ruled out."  Id.

Finally, the court applied this two-part analysis to the nonconsent towing ordinance at issue, and held that Bedford's action of contracting with a single towing service for nonconsent tows was a proprietary action and, therefore, not preempted by federal law.  See id. at 697 ("[T]he City's actions here did not constitute regulation or have the force and effect of law.  Accordingly, they are not preempted by section 14501(c).").

As to the first question, whether Bedford acted in its own interest in obtaining services comparable to a private entity in similar circumstances, the Cardinal Towing court recognized that because the ordinance involved only "true nonconsent tows where the owner of the vehicle was unwilling or unable to specify a towing company," id. at 694, Bedford was purchasing services from the market in place of the consumer.  In this situation, "the owner of the vehicle will by necessity be unable to choose a towing company" and "the only party that can make the type of merit selection inherent in market transactions is the party ordering the tow," namely the City of Bedford.  See id. at 695.  Because Bedford was purchasing towing services for an incapacitated or unwilling individual, it was in no different position than any other private actor.  Thus, the court recognized that the need to purchase towing services in the nonconsent situation was not motivated by a "regulatory impulse,"

18

but instead was motivated by the need for a service to be performed:

> [N]onconsensual tows do not involve any opportunity for market interaction on the part of the owner of the vehicle. The real decision is made by the party who ordered the tow, who chooses both to remove the vehicle and the party to perform the service. And whether the ordering party is the City or a private property owner, it seeks out this service in the pursuit of its own interests.

Id. at 696.

Regarding the second question, the Cardinal Towing court recognized that because the scope of the ordinance was narrow, focused on a single contract covering only a portion of the towing services market, the primary goal of the ordinance was to address a specific problem and not to encourage a general policy. The court distinguished situations involving "licensing" schemes and ordinances that affect industries as a whole, see id. at 693 n.2. (citing Harris County Wrecker Owners for Equal Opportunity v. City of Houston, 943 F. Supp. 711, 726 (S.D. Tex. 1996)), and held that "the limited scope here decisively forecloses an inference that the City sought to change the tow truck industry as a whole, let alone influence society at large." Id. at 694.

### 2. Application of *Cardinal Towing* to the Ordinances

Both parties agree that Cardinal Towing controls our analysis. Stucky argues that the consent/nonconsent distinction is dispositive because it defines the consumer of the towing service and thus clarifies whether the City is acting as a

19

consumer or as a regulator.  Stucky concedes that in a nonconsent

tow situation, because the driver of the vehicle is, by

definition, not available, the City becomes the consumer and

plays the market-participant role of choosing a towing service.

Stucky contends that, by contrast, in a consent tow situation,

the driver of the disabled vehicle is the market actor, and when

the City by statute chooses a towing service for that individual,

it is regulating, not purchasing services in a proprietary

manner.

Applying Cardinal Towing's two-part analysis, Stucky argues

that there is no need for the City efficiently to procure

services in the consent tow situation because private parties are

capable of contracting with a towing services themselves.

Further, Stucky asserts that the City's decision to define all

accident tows as nonconsent tows[11] demonstrates the regulatory,

---

[11]  Throughout this litigation, the City has contended that
all tows from the scene of accidents on public streets and
roadways are nonconsensual by virtue of § 19-391, which places
all authority to direct towing of vehicles with police or
municipal officials.  Recognizing that such a definition was
"problematic," the district court stated:

> In the first place, the State of Texas has defined consent
> and non-consent tows by statute.  See TEX. TRANS[P]. CODE
> § 643.201(e) (defining "consent tow" as a tow made with the
> consent of the owner or operator and "non-consent" tow as a
> tow made without the consent of the owner or operator of the
> vehicle).  In the second place, the City cannot, by sleight
> of hand (or language) simply eliminate the concerns
> addressed by the inquiry regarding whether a tow is
> consensual or nonconsensual. . . . It cannot be the case
> that simply redefining what a consent tow is eliminates that
> concern.  Therefore, the City's case . . . must rise or fall

20

as opposed to the proprietary, nature of the ordinances.  As Stucky argues, it is only through its police power to regulate that the City is able to classify all accident tows as nonconsensual, thus empowering itself with the authority to direct which towing service will perform the tow.

As to the second part of the Cardinal Towing analysis, Stucky argues that the regulatory policy affects the competitive environment for the entire consent towing industry. Specifically, Stucky contends that the City is preventing all towing companies (except for Texas Towing) from competing in the City-authorized consent towing market.  Further, the City is frustrating existing contracts that towing companies may have with vehicle owners (through dealerships, insurance carriers, or automobile organizations).  Stucky contends that such regulatory power, which can exclude other competitors from the market, is not a characteristic shared by private economic parties in similar circumstances.

---

on the assumption that its ordinances pertain to both consent and nonconsent tows, as such tows are defined by state statute.

Stucky v. City of San Antonio, No. CIV.A.SA96CA128EP, 2000 WL 33348252, at *3 (W.D. Tex. Apr. 4, 2000).  We agree that the City's argument is unpersuasive.  Under § 643.201(e)(2) & (e)(4) of the Texas Transportation Code, the state has set forth the definition of consent and nonconsent tows.  See TEX. TRANSP. CODE ANN. § 643.201(e)(2) & (e)(4) (1999); see also Fort Bend County Wrecker Ass'n v. Wright, 39 S.W.3d 421, 424 n.3 (Tex. App.—Houston [1st Dist.] Feb. 22, 2001).  We abide by those definitions.

21

In response, the City[12] argues that, as in Cardinal Towing, it shares a similar propriety interest in contracting with a single towing service for all (i.e., consent and nonconsent) City-authorized tows. The City points to issues of efficiency of service, guaranteed response time, twenty-four hour service, training, safety records, a clarification of responsibility, and easier administrative duties as reasons why the City has a proprietary interest in a single contract system. The City does not differentiate between consent tows and nonconsent tows, arguing that the issues of efficiency and safety do not depend on whether the driver is present to make a decision. The City contends that it "is a market participant because the City's responsibility to control the public streets, and to ease traffic congestion resulting from car wrecks remain, regardless of whether the tow is a consent or nonconsent tow." Further, the City contends that San Antonio, as the ninth largest city in the United States, spanning 417 square miles, requires a towing service that can address its needs. The City contends that its proprietary interest is heightened because of the large-scale operation involved in providing towing services to such a large city.

---

[12] Because the City and Texas Towing provide similar legal arguments, all references to the City's arguments should be interpreted to refer to the Appellees' collective arguments.

Regarding the second part of the Cardinal Towing analysis, the City argues that the Ordinances are narrowly drawn to address a single proprietary problem. For example, the challenged Ordinances do not restrict towing services involving customers who request towing from private property or towing services involving consensual tows from accidents in which the car was legally parked prior to the accident (provided it was not a traffic hazard).

While we concede that the City has a compelling practical argument for its need for efficient and safe towing services, we cannot ignore the express mandate of Congress to preempt such regulation of towing services. See 49 U.S.C. § 14501(c)(1). As has been demonstrated and will be discussed further infra, § 14501(c)'s purpose was to encourage competition in the intrastate towing services market. See Petrey, 246 F.3d at 554; Tocher, 219 F.3d at 1046; Ace Auto, 171 F.3d at 772; H.R. CONF. REP. NO. 103-677 (1994), reprinted in 1994 U.S.C.C.A.N. 1715, 1758-59. Accident towing, broadly defined as responding to any disabled vehicle on any public street, is without question a significant portion of the towing services market. Thus, a single contract system, which prevents consumers from consenting to hiring a towing service other than the one authorized by the City, does little to foster that market competition.

Further, the logic of Cardinal Towing compels us to find that a different market situation exists in the consent towing

23

market than in the nonconsent towing market.  Had this distinction not been critical to the court's holding in <u>Cardinal Towing</u>, much of the court's analysis would have been unnecessary.[13]  Therefore, applying the two-part analysis, we must agree with Stucky that the City, in enacting and enforcing the Ordinances that control consent tows, cannot be said to be acting as a market participant and, thus, cannot be exempted from § 14501(c)(1) under the municipal-proprietor exemption.

First, in the consent tow situation, unlike the nonconsent tow situation, there are two competing market actors attempting to purchase services.  Each market actor may wish to obtain towing services "in keeping with the ordinary behavior of private parties."  <u>Cardinal Towing</u>, 180 F.3d at 693.  The challenged Ordinances, however, frustrate the normal working of private decisionmaking in a market.  Under the Ordinances, if a private party wishes to employ the services of Towing Company "A" and the City wishes to employ the services of Towing Company "B", the City's choice controls.  This is so, not because the City needs to purchase the service for its own proprietary interest (i.e., "to serve the government's own [towing] needs"), but for the related safety interests of "society as a whole" (i.e., controlling public streets and easing traffic congestion).  <u>See</u>

_____

[13]  For example, the court simply could have stated that all City tows purchased by the City on public property were proprietary and, thus, exempt from § 14501(c)(1) preemption.

24

id. at 691. Thus, if we are to compare the City's actions to the "typical behavior of private parties," as <u>Cardinal Towing</u> instructs us to do, the conflict is readily apparent. In the consent tow situation, by countermanding a private party's choice of towing company, the City is acting at cross-purposes with the private party's market decision.

Furthermore, the City's market power cannot be said to be typical of similar private actors. In utilizing its police power to control a significant portion of the towing industry, the City's actions have the direct economic effect of contracting the market. This effect does not speak to a private proprietary purchase, but rather to a public regulatory plan. <u>See</u> <u>Tocher</u>, 219 F.3d at 1049 ("In analyzing the [municipal-proprietor] exception, it is vital to examine the substance of the transaction because a city may not use the guise of privity of contract to conduct otherwise forbidden regulatory activity." (citations and internal quotations omitted)).

Second, this court in <u>Cardinal Towing</u> relied on the "narrow scope" of the ordinance whereby the City "limited itself only to true nonconsent tows." <u>Id.</u> at 694.[14] Also important, was the fact that the ordinance involved "a single discreet [sic]

---

[14] Following <u>Cardinal Towing</u>, the Courts of Appeals for the Sixth and Ninth Circuits have both held that <u>nonconsensual</u> towing ordinances are exempt from preemption based on a municipal-proprietor/market-participant analysis. <u>See</u> <u>Petrey</u>, 246 F.3d at 559; <u>Tocher</u>, 219 F.3d at 1049.

25

contract." See id. at 693; see also Bldg. & Constr. Trades Council, 507 U.S. at 227 ("[T]he challenged action in this litigation was specifically tailored to one particular job.").

In the instant case, the scope of the Ordinances is obviously broader than the ordinance involved in Cardinal Towing because the Ordinances encompass all City-authorized (consent and nonconsent) tows. This scope, however, does not reach the level of industry licensing schemes and other industry-wide regulations previously held to be preempted by § 14501(c)(1). See Petrey, 246 F.3d at 564; Tocher, 219 F.3d at 1050. The scope of the Ordinances, therefore, falls somewhere in between these two established poles of existing precedent. Because we are unable to determine, based on an analytically satisfying continuum,[15] whether the instant Ordinances are within Cardinal Towing's "narrow scope," we turn to evaluate the purpose of the regulation. See Cardinal Towing, 180 F.3d at 692 (recognizing that courts have looked to whether "government entities seek to advance general societal goals rather than narrow proprietary interests through the use of their contracting power").

_____

[15] In order to determine the "scope" of the challenged action, the particulars of each market and the economic effect on the relevant market actors must be addressed. The difficulty in the instant case is that the record does not provide relevant information about the extent of City-authorized (consent and nonconsent) tows in proportion to the entire towing services industry in San Antonio. We are told that 50,000 tows were requested by the City in 1993; however, we do not have the denominator figure from which to compare that number to the entire towing industry.

26

As originally conceived, the Ordinances were a response to safety concerns affecting the City at large and were intended to be regulatory, and not proprietary, in nature. The enabling language of the original Ordinance No. 31977 (now codified as § 19-391), provides that the reason for enacting the Ordinances was to regulate and control the practice of tow truck drivers from racing to the scenes of accidents.[16] Ordinance No. 31977 explicitly stated that the City was acting as "the guardian of the public rights in the public streets, ways and public

_____

[16] Ordinance No. 31977 reads in relevant part:

Whereas, the City of San Antonio is the guardian of the public rights in the public streets, ways and public property within said City and holds title for the benefit of the public, and

Whereas, past experience indicates that automobile wreckers frequently race to the scene of automobile accidents in the hope of securing the business of towing in disabled motor vehicles for repairs, and . . .

Whereas, the efforts of the City police to control the aforementioned practices of automobile wrecker operators have not been successful, and

Whereas, the aforementioned practices of automobile wrecker operators offend against the public peace, safety and welfare of the City of San Antonio and require regulations and control, and

Whereas, in order to prevent confusion and traffic congestion which endanger public health, safety and property of the City of San Antonio it is deemed expedient, desirable and necessary to adopt regulations controlling the operation of automobile wreckers upon the public streets and ways of the City of San Antonio. . . .

San Antonio, Tex., Ordinance No. 31977 (Dec. 12, 1963).

27

property" and that its purpose was to protect the "public peace, safety and welfare of the City of San Antonio." Ordinance No. 31977 then explicitly provided that the City "deemed it expedient, desirable and necessary to adopt regulations controlling the operation of automobile wreckers upon the public streets and ways" of the City (emphasis added).

The original Ordinance No. 31977 has been amended and codified, but nothing in the record contradicts the conclusion that safety considerations to benefit "general societal interests" controlled all subsequent amendments to the Ordinances. Affidavits from the Chief of Police, the Police Captain in charge of vehicle storage, and the Deputy Chief of Police of the Support Services Division, in charge of overseeing the Vehicle Storage Unit, all support the understanding that the reason the City chose to regulate towing and selected a single-vendor system was to improve public safety.[17] In both the City's

---

[17] For example, Ron Bruner, the Police Captain in charge of vehicle storage at the San Antonio Police Department and Commander of the Community Services Section that oversees the Vehicle Storage Unit, stated in his affidavit:

> When developing and implementing towing policies for a municipality such as the City of San Antonio, the most critical issue is the danger to public safety arising from the obstruction of City streets and highways after vehicular accidents. The City of San Antonio has chosen to protect the public safety by contracting with a single towing company to provide services at the request of the City.

Jerry Pittman, the Deputy Chief of Police, Support Services Division, also echoed this understanding by stating: "The number one concern of the City in relation to towing situations is the

28

and Texas Towing's briefs and at oral argument, the parties agreed that safety was the primary consideration behind the passage and continued enforcement of the Ordinances.[18] Thus, unlike the proprietary-focused ordinance at issue in Cardinal Towing, the City's Ordinances have a broader regulatory purpose.[19]

Therefore, because the Ordinances restrict market competition, because the primary goal of the Ordinances is to regulate and improve the safety of the towing services on City streets, and because the Ordinances affect a significant portion of the towing industry in San Antonio, we conclude that the challenged actions of the City are regulatory in nature and cannot escape federal preemption under § 14501(c)(1) by way of

---

safety of the public."

[18] Finally, we note that, under state law, the regulation of traffic is a regulatory function of a municipality and not a proprietary function. See TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)(21) (1997) (recognizing the "regulation of traffic" as one of the functions exercised by the municipality in the interest of the general public); Murillo v. Vasquez, 949 S.W.2d 13, 17 (Tex. App.—San Antonio 1997, writ denied) (recognizing that the regulation of traffic is a "classic" example of a governmental regulatory function).

[19] We recognize, of course, that this same "purpose" underlies the nonconsent tows covered by the Ordinances. That the City may have initially entered into the single-vendor system for safety reasons, however, does not affect the analysis under Cardinal Towing, that nonconsensual tows can escape federal preemption under the municipal-proprietor/market-participant exemption. The logic of the first part of the Cardinal Towing analysis demonstrates the proprietary nature of the City's need to procure towing services in the nonconsent towing situation. The issue has been decided and is not before us on appeal.

the municipal-proprietor exemption.  Simply stated, the government interaction with the market is not so narrowly focused that we can "safely rule out" the "regulatory impulse" of the City.  See Cardinal Towing, 180 F.3d at 693.

Having determined that the municipal-proprietor/market-participant rationale applied in Cardinal Towing cannot be applied to the consensual towing situation in the City of San Antonio, we next turn to whether the Ordinances can be exempted under the statutory safety exception provided for in § 14501(c)(2)(A).

B. The Safety Exemption Under 49 U.S.C. § 14501(c)(2)(A)

The second relevant exception to the preemption doctrine is the "safety exemption" contained in § 14501(c)(2)(A), which provides:

> (2) Matters not covered.— Paragraph (1) [§ 14501(c)(1)]—
> (A) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.

49 U.S.C. § 14501(c)(2)(A).  The City argues that even if it cannot be considered a market participant in the consent tow situation, because the Ordinances were enacted to address safety concerns arising from the towing practices in the City, § 14501(c)(2)(A) should be interpreted to exempt the Ordinances

30

from federal preemption. The City asserts that because § 14501(c)(2)(A) provides that the safety regulatory authority of a State shall not be restricted with respect to motor vehicles, this reserves the authority of the State to delegate its regulatory power to municipalities like the City.[20] The City contends that because states have traditionally redelegated regulatory powers to municipalities, and because Congress did not clearly or manifestly preempt this redelegation authority, § 14501(c)(2)(A) covers municipal safety ordinances that are enacted pursuant to a delegation of state authority.

Stucky, in contrast, argues that § 14501(c)(2)(A) does not save the City's towing Ordinances from preemption because § 14501(c)(2)(A) is directed only at the authority of the state and not the political subdivision of the state. Stucky points to the fact that the general preemption language in § 14501(c)(1) covers a "state [or] political subdivision of a State," but that the text of § 14501(c)(2)(A) omits the phrase "political subdivision of the State." Stucky asserts that this omission was intentional and that it furthers the deregulatory purpose of the statute. Therefore, Stucky contends that the City cannot

---

[20] The State of Texas has, in fact, delegated this authority to municipalities. See TEX. TRANSP. CODE ANN. § 643.201(a) (1999) ("[A] municipality may regulate the operation of a tow truck to the extent allowed by federal law."); Northway Towing, Inc. v. City of Pasadena, Tex., 94 F. Supp. 2d 801, 802 (S.D. Tex. 2000) ("[T]he State of Texas has specifically delegated its authority to regulate towing to its political subdivisions.").

31

circumvent the express language of the statute by relying on a redelegation of state authority.

This court was not required to address this provision in Cardinal Towing; however, other courts have confronted the safety exemption in § 14501(c)(2)(A) and have disagreed on its application to municipal ordinances such as the ones at issue. The Courts of Appeals for the Sixth, Ninth, and Eleventh Circuits have each held that § 14501(c)(2)(A) does not exempt municipal ordinances from the general preemptive reach of § 14501(c)(1). See Petrey, 246 F.3d at 563; Tocher, 219 F.3d at 1051; Mayer, 158 F.3d at 545-47. However, the Second Circuit and several district courts in this circuit have come to the opposite conclusion, finding that § 14501(c)(2)(A) explicitly exempts safety-focused municipal towing ordinances from § 14501(c)(1). See Ace Auto, 171 F.3d at 774-75; Northway Towing, Inc. v. City of Pasadena, Tex., 94 F. Supp. 2d 801, 802 (S.D. Tex. 2000); Harris County Wrecker Owners for Equal Opportunity v. City of Houston, 943 F. Supp. 711, 726 (S.D. Tex. 1996); New Orleans Towing Ass'n v. City of New Orleans, No. CIV.A.99-3131, 2000 WL 193071, at *8 (E.D. La. Feb. 12, 2000); AJ's Wrecker Serv., Inc. v. City of Dallas, No. CIV.A.3:97-CV-1311D, 1998 WL 185521, at *3 (N.D. Tex. Apr. 15, 1998).

Because of the closeness of the issue and the soundness of the arguments on either side, we set forth the contrasting arguments below. As is our practice in questions of statutory

32

interpretation, we look to the text, structure, and legislative history of the provision in question.  See City of Dallas, Tex. v. Fed. Communications Comm'n, 118 F.3d 393, 396 (5th Cir. 1997). We also address the determinations made by our sister circuits and the district courts in this circuit that have confronted this difficult issue.

### 1. Statutory Language and Structure

"Interpretation of the statutory language is key to construing its preemptive force."  Hodges v. Delta Airlines, Inc., 44 F.3d 334, 335-36 (5th Cir. 1995).  Furthermore, in order to discern Congress's intent, we must examine the language of § 14501(c)(2)(A) in the context of the legislation of which it is a part.  See Bennett v. Spear, 520 U.S. 154, 173 (1997) (recognizing that statutory provisions must be examined in the context of the entire statute).

In reviewing the text and structure of § 14501(c)(2)(A), the express statutory language does not provide for municipalities or other "political subdivisions of a State" to be exempted from the preemptive reach of § 14501(c)(1).  For this reason, several circuit courts of appeals have found that Congress did not intend for municipalities to be exempted from preemption, even for safety reasons.  "The language of § 14501 provides fairly convincing evidence that the safety regulation exception to preemption was not meant to apply to a state's political subdivisions. . . . [W]ithin § 14501, 'political subdivision[s]'

33

are mentioned seven times, yet the term is not mentioned at all in § 14501(c)(2)(A)."  Petrey, 246 F.3d at 561.  Similarly, as the Eleventh Circuit recognized in Mayer:

> [Section] 14501 contains no fewer than seven express references to the regulatory authority of the political subdivisions of the states in its other subsections, §§ 14501(a), 14501(b), 14501(c)(1), 14501(c)(2)(C), 14501(c)(3)(A), 14501(c)(3)(B), and 14501(c)(3)(C), but omits any references to political subdivisions in § 14501(c)(2)(A). . . . In fact, § 14501(c)(2)(A) is the only subsection of the statute that mentions the regulatory authority of a state without also mentioning the regulatory authority of the state's political subdivisions.

Mayer, 158 F.3d at 545; see also Tocher, 219 F.3d at 1051 ("[S]ection 14501 contains no less than seven references to the regulatory authority of political subdivisions, but is conspicuously silent in section 14501(c)(2)(A).").

These courts have relied on the general presumption that when "Congress omits certain language in a particular subsection of a statute and includes the language in other subsections, the omission is intentional rather than accidental."  Mayer, 158 F.3d at 545; see also Tocher, 219 F.3d at 1051 ("'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting in parenthetical Russello v. United States, 464 U.S. 16, 23 (1983)).  These courts have concluded that the omission of the statutory language was deliberate and not a drafting error:  "We cannot say that

34

Congress simply made a mistake by failing to include political subdivisions in the exception to preemption in § 14501(c)(2)(A). Instead, Congress's silence in failing to include political subdivisions in § 14501(c)(2)(A) clearly indicates that municipal safety regulation was not meant to be exempted from preemption." Petrey, 246 F.3d at 563; Mayer, 158 F.3d at 545-46 ("We find it unlikely that this omission reflects a drafting error, because a similar preemption provision contained in the Airline Deregulation Act, 49 U.S.C. § 41713(b)(4)(B)(I), contains the same omission.").

These courts have also recognized that "[t]he Act itself defines the term 'State' to 'mean[] the 50 States of the United States and the District of Columbia,' and therefore provides no justification for reading the term 'State' to include its political subdivisions." Mayer, 158 F.3d at 545; see also Tocher, 219 F.3d at 1051 ("The term 'State' under the FAAA is defined as 'the 50 States of the United States and the District of Columbia' . . . and a plain reading of this provision indicates that municipalities are not included within that definition."). Further, the statutory language of § 14501(c)(2)(A) only addresses State regulation of "motor vehicles" and not the "motor carriers" at issue under the towing Ordinances.[21] As a result, based on the text and structure of

---

[21] "Motor vehicle" is defined as "a vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical

35

§ 14501(c)(2)(A), these courts have declined to apply the safety exemption to municipal ordinances.

In contrast, the Second Circuit and certain federal district courts in this circuit have come to an opposite conclusion based on their interpretation of the statutory language. In Ace Auto, the Second Circuit concluded that, while the text of § 14501(c)(2)(A) does not preserve the regulatory authority of political subdivisions of the state, "we see no reason to construe this language to prevent the state from delegating its regulatory authority to a municipality." Ace Auto, 171 F.3d at 765. In similar fashion, a district court in the Southern District of Texas found that congressional delegation of "regulatory authority to a state may well mean that it is permitted to redelegate its authority to a political subdivision either specifically or by leaving undisturbed existing statutes that would otherwise provide a local government with ample authority to regulate." Harris County Wrecker, 943 F. Supp. at 726 (citations, internal quotations, and alterations omitted).

Both courts relied on Wisconsin Public Intervenor v. Mortier, 501 U.S. 597, 607-08 (1991), for their interpretation of § 14501(c)(2)(A). See Ace Auto, 171 F.3d at 765; Harris County

---

power and used on a highway in transportation, or a combination determined by the Secretary, but does not include a vehicle, locomotive, or car operated only on a rail . . . ." 49 U.S.C. § 13102(14). The definition of "motor carrier" is set out supra in note 4.

36

<u>Wrecker</u>, 943 F. Supp. at 726.  In <u>Mortier</u>, the Supreme Court held that under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), states were permitted to redelegate authority to political subdivisions even without explicit statutory language so providing.  <u>See</u> 501 U.S. at 607-09.  The FIFRA statute only permits a "State" to regulate pesticides, <u>see</u> 7 U.S.C. § 136v(a), and defines a "State" as "a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Trust Territory of the Pacific Islands, and American Samoa."  7 U.S.C. § 136(aa).  The <u>Mortier</u> Court held, however, that the statute's silence with regard to local governments could not be read "to establish a clear and manifest purpose to preempt local authority."  <u>Id.</u> at 607 (internal quotations and citations omitted).  The Court stated further:

> The principle is well settled that local governmental units are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them . . . in [its] absolute discretion.  The exclusion of political subdivisions cannot be inferred from the express authorization to the "State[s]" because political subdivisions are components of the very entity the statute empowers.  Indeed, the more plausible reading of FIFRA's authorization to the States leaves the allocation of regulatory authority to the "absolute discretion" of the States themselves, including the option of leaving local regulation of pesticides in the hands of local authorities.

<u>Id.</u> at 607-08 (citations and some internal quotations omitted) (alterations in original).  Based on the language in <u>Mortier</u>, these courts found that § 14501(c)(2)(A)'s failure to mention a

37

political subdivision of a state did not control the preemption analysis.

The Second Circuit also relied on the interpretation given to § 14501(c)(2)(A) by the United States Department of Transportation. In a document entitled "Intrastate Trucking Deregulation: An Analysis and Interpretation of Title VI, Federal Aviation Administration Authorization Act of 1994," the Department stated:

> We believe that State or <u>local regulations</u> governing the towing of damaged or abandoned vehicles that are public safety hazards would fall within this exemption, assuming again that such regulations are not a guise for broader economic restrictions.

See <u>Ace Auto</u>, 171 F.3d at 775 (emphasis added) (quoting U.S. Dep't of Transp., <u>Intrastate Trucking Deregulation: An Analysis and Interpretation of Title VI, Federal Aviation Administration Authorization Act of 1994</u>, P.L. 103-305 (Mar. 1995)).

Furthermore, consistent with the decisions on this side of the debate and with the City's argument, we note that the statutory language at issue is phrased in the negative — stating that the federal statute shall <u>not</u> restrict a state from regulating the safety of motor vehicles. <u>See</u> 49 U.S.C. § 14501(c)(2)(A). As the City argues, if we were to find that the State of Texas cannot redelegate its authority to

38

municipalities such as the City, we would, by necessity, be restricting that state's ability to regulate.[22]

Faced with this difficult task of statutory interpretation, we ultimately conclude that we must adopt a plain reading of the language and structure of § 14501(c)(2)(A). We thus join the majority of circuits in interpreting the omission of the phrase "political subdivision of a State" as Congress's "clear and manifest" intent to preempt municipal safety regulation of the towing industry. As three of our sister circuits have found, foundational principles of statutory construction guide us to presume that Congress intended the language contained within the statute. See Petrey, 246 F.3d at 561; Tocher, 219 F.3d at 1051; Mayer, 158 F.3d at 545-46; see also BFP v. Resolution Trust Corp., 511 U.S. 531, 537 (1994) ("[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." (alteration in original)). Because Congress did include the language "political subdivision of a State" in seven other provisions of the statute and did not include it in

---

[22] This argument follows from the fact that, as mentioned, Texas has specifically delegated its authority "to the extent allowed by federal law." See TEX. TRANSP. CODE ANN. § 643.201(a). Under Supremacy Clause principles, we interpret this delegation as being limited by the dictates of Congress's stated intent in § 14501(c)(1) and § 14501(c)(2)(A). See U.S. CONST. art. VI, cl. 2.

§ 14501(c)(2)(A), we are unwilling to interpret the statute against its plain meaning.[23]

We also find reliance on Mortier misplaced. Those courts that have relied on Mortier to conclude that § 14501(c)(2)(A)'s statutory silence as to local governments permits the delegation of state safety authority to municipalities have failed to recognize that the statutes at issue are quite different. FIFRA, in contrast to § 14501(c), does not contain express preemption language. More specifically, as both the Mayer and Petrey courts have recognized, "the specific FIFRA provision interpreted in Mortier made no reference to political subdivisions whatsoever, and FIFRA as a whole contains only scattered mention of political subdivisions in its other parts." Petrey, 246 F.3d at 562 (citing Mayer, 158 F.3d at 547) (internal quotations omitted). In contrast, § 14501 contains "seven references to political subdivisions overall, a reference to political subdivisions in the general preemption provision, and a reference to political subdivisions in one of the exceptions to the general preemption provision." Petrey, 246 F.3d at 562. Thus, Congress's almost complete silence throughout FIFRA concerning political subdivisions simply cannot be equated with the language of § 14501 and the particular omission in § 14501(c)(2)(A).

---

[23] Further, we are guided by the definition of "State" included in 49 U.S.C. § 13102(18), which does not include a political subdivision of a state.

40

Finally, we agree with the Eleventh Circuit that "Mortier . . . falls short of establishing a rule that the word 'State' must be interpreted to include political subdivisions in all circumstances."  Mayer, 158 F.3d at 547.  Such an interpretation, we recognize, would have perverse consequences:

> [Such a] reading of the safety exception would lead to the absurd result that Congress can never preempt local regulations and simultaneously leave a state's ability to regulate intact.  If this Court were to hold that a state can always delegate its responsibility to municipalities, Congress would always be required to preempt both state and local laws, or preempt neither.  That result would violate fundamental principles of federalism and lead to a distorted interpretation of the Supremacy Clause.

Tocher, 219 F.3d at 1051.  Thus, we cannot agree with those courts that have, based on Mortier, allowed municipalities to avoid preemption through a redelegation theory.

It is this final point that also aids us in resolving the most difficult argument presented by the City — namely, how to square the negatively phrased "shall not restrict the safety regulatory authority of a State with respect to motor vehicles" language, with the determination that states may not redelegate their safety authority over motor carriers to municipalities.  As an analysis of the legislative purpose and history of § 14501(c)(2)(A) demonstrates, Congress's decision to permit regulation of certain facets of the transportation industry at the state level, but not at the local level, was a deliberate action intended to further competitive markets.  We now turn to that analysis.

41

## 2. Legislative History and Purpose

As with the textual analysis, courts have differed regarding how best to interpret the legislative history of the safety exemption in § 14501(c)(2)(A).  Again, the Sixth, Ninth, and Eleventh Circuits have held that the legislative history supports the argument that municipalities were not intended to benefit from the safety exemption.  "The legislative purpose and history of § 14501 . . . support the notion that Congress's failure to include political subdivisions in § 14501(c)(2)(A) was deliberate."  See Petrey, 246 F.3d at 563; see also Tocher, 219 F.3d at 1051; Mayer, 158 F.3d at 546.

First, these courts point to the ICCTA's conference report, which expressed Congress's intent to promote greater competition:

> [T]he conferees believe preemption legislation is in the public interest as well as necessary to facilitate interstate commerce.  State economic regulation of motor carrier operations causes significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology and curtails the expansion of markets. . . . The sheer diversity of these regulatory schemes is a huge problem for national and regional carriers attempting to conduct a standard way of doing business.

H.R. CONF. REP. NO. 103-677, at 87 (1994), reprinted in 1994 U.S.C.C.A.N. 1715, 1759; see also Petrey 246 F.3d at 563; Mayer, 158 F.3d at 546.[24]  These courts recognize that a "strict

---

[24]  The debates in the House of Representatives support the conclusion that the inclusion of § 14501(c)(2)(C) was meant to exempt nonconsensual towing prices from preemption but leave consensual towing preempted by § 14501(c):

The pending legislation would restore the local authority to

reading" of § 14501(c)(2)(A) "furthers the policy of deregulation underlying the enactment of section 14501.  Allowing both states and municipalities to escape preemption under the guise of regulating safety could lead to widespread, diverse regulation of motor carriers, precisely what Congress sought to avoid in promulgating a broad preemption statute."  Tocher, 219 F.3d at 1051; see also Mayer, 158 F.3d at 546.

The legislative purpose, therefore, was to increase competition by eliminating overlapping and potentially inconsistent local regulations, without undermining the states' ability to regulate motor vehicle safety, highway route controls, hazardous cargo, or motor carrier insurance requirements.  See 49 U.S.C. § 14501(c)(2)(A).  "Stated differently, it is reasonable to assume that Congress decided that safety and insurance ordinances must be enacted on a statewide level, in order to minimize the disturbance to the motor transportation industry

---

engage in regulating the prices charged by tow trucks in nonconsensual towing situations.  Regulation of routes and services, as well as regulation of consensual towing, would still be preempted.

Nonconsensual towing situations are those where the owner of the vehicle is unable to consent to it being towed, such as in cases of a severe accident, where the vehicle is towed from a commercial establishment for being illegally parked, or towed from city streets as a result of police order.

141 Cong. Rec. H15,602 (daily ed. Dec. 22, 1995) (statement of Rep. Rahall) (emphasis added).

43

that a patchwork of local ordinances inevitably would create."

Mayer, 158 F.3d at 546.

The Second Circuit, however, has interpreted the legislative history in broader terms, allowing for the delegation of state safety authority to municipalities. In evaluating the same ICCTA conference report on which Stucky and the other circuits have relied, the court stated: "[W]e see no reason to construe this language to prevent the state from delegating its regulatory authority to a municipality. To the contrary, the legislative history indicates that state safety regulatory authority (including, presumably, the authority to delegate) was to be 'unaffected' by the preemption statute." Ace Auto, 171 F.3d at 775 (quoting H.R. CONF. REP. NO. 103-677, at 84, 85, reprinted in 1994 U.S.C.C.A.N. at 1756, 1757). The Second Circuit further stated:

> [A]lthough the legislative history clearly illustrates Congress' deregulatory purpose, the history is ambiguous as to the scope of that purpose. More particularly, the reports issued in connection with § 14501 suggest that its primary purpose was to eliminate local economic regulation, not local safety regulation. To the extent that the scope of Congress' purpose is unclear, we hesitate to construe the text of § 14501 so as to frustrate unnecessarily the ability of municipalities to respond to the local safety concerns created by local towing industries.

Ace Auto, 171 F.3d at 775 (citing H.R. CONF. REP. NO. 103-677, at 86-87 (1994), reprinted in 1994 U.S.C.C.A.N. at 1758-59) (internal citation omitted); Harris County Wrecker, 943 F. Supp. at 727 ("[T]here is no evidence or congressional findings that

44

municipal safety regulations would interfere with Congress's concern for competitiveness in tow trucking.").

After our own review of the legislative history, we are compelled to agree with the conclusions of the Sixth, Ninth, and Eleventh Circuits. While acknowledging the closeness of the question, we hold that any ambiguity in the legislative history must be resolved consistent with our plain reading of the statute.

Primarily, our reasoning rests on three interrelated factors. First, all courts addressing this issue have recognized that § 14501(c) was enacted with a deregulatory purpose. By interpreting the legislative history consistent with the plain language of the exemptions in § 14501(c)(2)(A), we further that purpose.

Second, we find it reasonable that in mentioning only "States" in § 14501(c)(2)(A), Congress intended to permit regulation of certain components of the transportation industry at the state level and preclude those same regulations at the local level. See Mayer, 158 F.3d at 546 n.6 ("By requiring that safety and insurance ordinances must be enacted on a statewide basis, the costs associated with complying with the ordinances are reduced dramatically, which is an outcome that is consistent with the policy objectives of the ICCTA."). This "partial" preemption preserves state control over state interests and yet fosters deregulation by preventing a patchwork of municipal and

45

county safety and insurance regulations from impeding the competitive development of the towing services industry.

Finally, we are unconvinced by the distinction relied on by the Second Circuit, that Congress intended to eliminate "local economic regulation," but not "local safety regulation." Ace Auto, 171 F.3d at 775-76. While the statement of intent may be accurate, the instant case proves the fragility of the distinction, as the single-vendor system, if exempted as a "safety regulation," would result in an economically noncompetitive market for all City-authorized consent and nonconsent tows. Thus, under the guise of safety regulation, the economics of the intrastate towing market would be shifted away from the competitive market envisioned by Congress. As was recognized in oral argument, under the City's argument there is no stopping point for the potential reach of the safety exemption. Pursuant to § 14501(c)(2)(A), municipalities potentially could designate all tows in the City as implicating safety concerns and thus regulate the entire towing industry under the safety exemption. We do not believe Congress created § 14501(c)(2)(A) to be a loophole through which local governments could avoid the general preemptive reach of § 14501(c)(1).

Therefore, we hold that the City's Ordinances involving consent towing cannot escape federal preemption under the safety exemption of § 14501(c)(2)(A). The plain reading of the statute, supported by its legislative history, demonstrates Congress's

46

clear and manifest intent not to include political subdivisions of the state within that exemption.

## V. CONCLUSION

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for proceedings consistent with this opinion.